# HOWE *v.* SMITH, ATTORNEY GENERAL, ET AL.

No. 80–5392.  Argued April 28, 1981—Decided June 17, 1981

Burger, C. J., delivered the opinion of the Court, in which Brennan, White, Marshall, Blackmun, Powell, and Rehnquist, JJ., joined. Stevens, J., filed an opinion concurring in the judgment, *post,* p. 487. Stewart, J., filed a dissenting statement, *post,* p. 487.

*William A. Nelson* argued the cause for petitioner. With him on the briefs was *James L. Morse.*

*Barbara E. Etkind* argued the cause for the federal respondents. With her on the brief were *Solicitor General McCree, Assistant Attorney General Jensen,* and *Deputy Solicitor General Frey. John J. Easton, Jr.,* Attorney General of Vermont, argued the cause for respondent Ciuros. With him on the brief were *Peter M. Nowlan* and *Alan B. Coulman,* Assistant Attorneys General.*

Chief Justice Burger delivered the opinion of the Court.

The question presented by this case is whether a State may transfer a prisoner to federal custody pursuant to 18 U. S. C.

*Briefs of *amicus curiae* urging reversal were filed by *Ernest Winsor* for Families & Friends of Prisoners, Inc., et al.; and by *David J. Gottlieb* for the Kansas Defender Project.

§ 5003 [1] in the absence of a prior determination that the prisoner who is being transferred has a need for specialized treatment available in the federal prison system.

## I

In December 1974, the Commissioner of Corrections for the State of Vermont announced that he would soon close the 187-year-old Windsor prison, the State's only maximum-security facility, because Windsor had become inadequate in several respects. *Rebideau* v. *Stoneman,* 398 F. Supp. 805, 808, n. 7 (Vt. 1975). In anticipation of that closing, the United States and Vermont entered into an agreement pursuant to 18 U. S. C. § 5003 (a) by which the United States agreed to house in federal prisons up to 40 prisoners originally committed to the prisons of Vermont.[2] The contract recited that

---

[1] Title 18 U. S. C. § 5003 provides in pertinent part:

"(a) The Attorney General, when the Director [of the United States Bureau of Prisons] shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory: *Provided,* That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.

.          .          .          .          .

"(c) Unless otherwise specifically provided in the contract, a person committed to the Attorney General hereunder shall be subject to all the provisions of law and regulations applicable to persons committed for violations of laws of the United States not inconsistent with the sentence imposed."

[2] The contract between the United States and Vermont provides in pertinent part:

"1. The [United States] will undertake the custody, care and treatment, including the furnishings and subsistence and all necessary medical and hospital services and supplies, of State prisoners committed to the Federal institution. . . .

"2. The State may without prior approval by the [United States] and without individual application to the [United States] transfer up to 40

the Director of the United States Bureau of Prisons had certified that facilities were available at federal institutions to accommodate 40 Vermont prisoners.

In 1975, when Windsor was finally closed, Vermont was left with several minimum-security community correctional centers and the Vermont Correction and Diagnostic Treatment Facility at St. Albans, Vt. St. Albans has the capacity for short-term incarceration of inmates with high security needs, but it is not designed for long-term incarceration of inmates classified as high security risks.

## II

The petitioner, Robert Howe, was convicted in a Vermont court of first-degree murder arising out of the rape and strangulation of an elderly female neighbor. He was sentenced to life imprisonment and assigned to the St. Albans facility to begin serving his sentence. Because of the nature of his offense and the length of his term, however, the Classification Committee of the Vermont Department of Corrections determined that he should be kept in a maximum-security facility and recommended that he be transferred to a federal prison. Accordingly, the Vermont Department of Corrections held a hearing to decide whether he should be transferred to a federal institution. Howe was afforded advance notice of the hearing and of the reasons for the proposed transfer; he was present at the hearing; and he was represented by a law adviser from the facility's staff, who submitted various items of evidence in opposition to the proposed transfer.

The hearing officer recommended that the petitioner be transferred to a federal institution on the ground that "no treatment programs exist in the State of Vermont, which could provide both treatment and long term maximum security supervision" for him. App. 25. The hearing officer found

State prisoners for commitment to a Bureau of Prisons facility." 625 F. 2d 454, 455, n. 1 (1980).

that Howe was dangerous and could not be integrated into a community-based program. The State relied on a psychiatric report describing Howe as a " 'dangerous person who could well repeat the same pattern of assaultive behavior toward women at any time in the future.' " *Id.*, at 26. The hearing officer also found that Howe would be "highly resistant to treatment" and that he was an escape risk. Indeed, Howe had escaped from the maximum-security wing of St. Albans while detained there prior to his trial.

On March 9, 1977, Vermont's Acting Commissioner of Corrections approved Howe's transfer to the federal prison system. Under the terms of the contract between the United States and Vermont, he was incarcerated initially in the federal penitentiary at Atlanta, Ga., and later was transferred to the federal penitentiary at Terre Haute, Ind.

As an inmate in the federal maximum-security penitentiaries, Howe enjoyed the same complete freedom of movement within the institution as other prisoners. By contrast, at St. Albans, he had not been given this freedom of movement, but had been generally confined to the maximum-security wing. The programs at St. Albans were substantially the same as those at the federal prisons, although Howe had less opportunity to take advantage of them because of the restrictions on his mobility at the state facility. The only two programs in which he actually participated at St. Albans were psychiatric counseling and educational courses. At Terre Haute, he ran a sewing machine until he had a heart attack. His principal activities now are knitting and crocheting.

On December 5, 1978, the petitioner filed this civil action in the United States District Court for the District of Vermont, naming as defendants the Attorney General of the United States and the Director of the Federal Bureau of Prisons. Respondent William Ciuros, Vermont's Commissioner of Corrections, intervened. Relying on *Lono* v. *Fenton*, 581 F. 2d 645 (CA7 1978) (en banc), the petitioner challenged his transfer to the federal prison system on the ground that the

federal officials lacked statutory authority to accept custody. It was the petitioner's position that the sole statutory authority for transfers of state inmates, § 5003, requires federal authorities to make an individual determination that each state prisoner so transferred needs a particular specialized treatment program available in the federal prison system. The petitioner argued that no such individual determination had been made in his case, and that the transfer had not been effected for special treatment needs but for general penological reasons, that is, maximum-security incarceration.

Following a hearing, the District Court denied the petitioner's request for relief, holding:

> "[T]he [A]ct plainly and unambiguously requires no showing of specialized treatment needs or facilities before a Vermont state prisoner may be transferred to the federal prison system in accordance with the contract under which [the petitioner] was so transferred. . . . 18 U. S. C. 5003 (a) requires nothing more of the Director of the Bureau of Prisons than a certification that facilities exist within the federal system in which state prisoners may be accommodated. That requirement has been met in the case at hand." 480 F. Supp. 111, 115 (1978).

The Court of Appeals for the Second Circuit affirmed. 625 F. 2d 454 (1980). The court observed that 18 U. S. C. § 5003 authorizes states to contract not simply for "treatment" but for the "custody, care, subsistence, education, treatment, and training of persons convicted." It reasoned that nothing in the language of the statute gives "treatment" primacy or provides a basis for concluding that, whatever other services are provided, "treatment" must always be furnished to prisoners transferred under the statute. While acknowledging that there was a modicum of support in the legislative history for the petitioner's argument, the Court of Appeals rejected it because it "has no basis in the language of the statute." 625 F. 2d, at 457.

We granted certiorari to resolve the conflict in the Circuits. *Sub nom. Howe* v. *Civiletti,* 449 U. S. 1123 (1981).

### III

The challenge here is not to the action of the State of Vermont in seeking to transfer the petitioner, but to the authority of the Federal Government, in the official person of the Attorney General, to receive and to hold him in a federal penitentiary. Under 18 U. S. C. § 4001 (a) "no citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." [3] The petitioner avers that he is being held by the federal authorities illegally because neither § 5003 nor any other provision authorizes his detention. In particular, he argues that § 5003 has a narrow and limited thrust, that is, that a state prisoner may not be transferred to a federal institution except for an identified specialized treatment and that, before any such transfer may be made, the Federal Government must conduct an inquiry and make an individualized determination that the transferee needs, and the federal facility can provide, that treatment.[4] On the other hand, the respondents contend that § 5003 is

---

[3] The federal respondents argue that the petitioner lacked standing to bring this action because he is not a federal prisoner, but merely a prisoner of the State of Vermont temporarily in the custody of the Federal Government. This argument, raised for the first time in this Court, fails to give adequate weight to the plain language of § 4001 (a) proscribing detention *of any kind* by the United States, absent a congressional grant of authority to detain. If the petitioner is correct that neither § 5003 nor any other Act of Congress authorizes his detention by federal authorities, his detention would be illegal even though that detention is on behalf, and at the pleasure, of the State of Vermont.

[4] Though the Seventh Circuit, in both *Lono* v. *Fenton,* 581 F. 2d 645 (1978) (en banc), and *Anthony* v. *Wilkinson,* 637 F. 2d 1130 (1980), held that absence of suitable state facilities is a precondition for a § 5003 transfer, the petitioner expressly disavows that contention in this Court. Reply Brief for the Petitioner 7. The petitioner argues only that § 5003 requires a finding that the proposed transferee is in need of specialized treatment and that the needed treatment is in fact available in the federal system.

not so limited, and that the petitioner's detention is clearly authorized by the plain language of that provision.

Because § 5003 obviously authorizes federal detention of state prisoners under *some* circumstances, our task is to determine the precise nature of those circumstances and whether appropriate circumstances are present in this case.

## A

As in every case involving the interpretation of a statute, analysis must begin with the language employed by Congress. *Rubin* v. *United States,* 449 U. S. 424, 430 (1981); *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 337 (1979). By its terms, § 5003 (a) authorizes the Attorney General to contract with a state or territory "for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of [that] State or Territory." On its face, the authority furnished by this language encompasses much more than a limited authority to provide for the specialized treatment needs of state prisoners. "Treatment" is, after all, only one of several services cataloged; the focus of the statute, is upon care, custody, subsistence, education, and training as well as upon treatment. Nothing in the construction of the provision supports the view that "treatment" is more important than any of the other listed categories, and nothing in the passage can be fairly read as requiring that some kind of "treatment" must be furnished to every state prisoner transferred to a federal facility pursuant to a contract authorized by § 5003 (a).

The petitioner does not contest the breadth of the charter granted by the language just quoted. Rather, he focuses on the requirement that the Director of the Federal Bureau of Prisons certify the availability of "proper and adequate treatment facilities and personnel." The petitioner reads this requirement as imposing a substantive limitation or restriction on the purposes for which prisoners may be transferred: to wit, a prisoner may be transferred only for treatment.

The petitioner's reading of the statute strains the plain meaning of its language. The act of certification by the Director is nothing more than the starting point in the process of contractual negotiation envisioned by § 5003 (a). Absent surplus capacity in the federal system, discussions between federal and state authorities regarding the transfer of state prisoners to federal facilities would be pointless. Once the Director certifies that a surplus capacity exists—that is, that there is room for more inmates—the transfer becomes a possibility. The certification clause cannot be read as requiring any more than that federal facilities and personnel must be available to handle whatever prisoners are received.

There is no special significance to the fact that the Director certifies the existence of *"treatment* facilities," as opposed to prison facilities generally.[5] First, the term "treatment facilities" is an appropriate general reference to the existing federal prison facilities. It is true, of course, that other terms may be used—and, in fact, are used [6]—to describe the federal prisons; that, however, does not belie the appropriateness of the term "treatment facilities" as a general reference to the federal penal system.

Second, if, as the petitioner advocates, the phrase "treatment facilities" is read as a substantive restriction upon the purposes for which a prisoner may be transferred, § 5003 is rendered internally inconsistent. According to the petitioner,

---

[5] The petitioner argues that the concept of "treatment" is limited to such things as medical treatment, psychiatric treatment, alcohol or drug rehabilitation programs, and special programs for juveniles. In his view, the concept does not include secure incarceration for dangerous offenders.

[6] The petitioner notes that there are statutes referring to federal prisons as "penal institutions" or "correctional institutions." But those statutes were passed by Congresses other than the Congress that passed § 5003. Moreover, those statutes typically concern the operation or management of prisons as institutional entities rather than processing of prisoners within them. In any event, places of confinement under sentence have long been described in alternative terms.

by virtue of § 5003 (a), a state prisoner may be transferred to a federal prison only if that facility affords him specialized treatment found to be needed. However, § 5003 (c) provides, with certain exceptions not applicable to this case, that all state prisoners in federal custody are subject to the same statutory and regulatory scheme that governs federal prisoners.[7] And that statutory and regulatory scheme contains provisions that would undermine § 5003 (a) as that section is read by the petitioner. For example, by statute, federal prisoners may be transferred from one facility to another at the discretion of the Attorney General, 18 U. S. C. § 4082 (b), and federal officials have discretion to decide which inmates have access to rehabilitation programs, *Moody* v. *Daggett,* 429 U. S. 78, 88, n. 9 (1976). It makes no sense to interpret § 5003 as forcing federal authorities to accept only a state prisoner who is in need of treatment at a particular facility when those same officials are free to transfer that same prisoner from the facility, thereby denying him access to the treatment program.

In sum, the plain language of § 5003 (a) authorizes contracts not simply for treatment, but also for the custody, care, subsistence, education, and training of state prisoners in federal facilities. The certification requirement is simply a housekeeping measure designed to ensure that the federal system has the capacity to absorb the state prisoners. Nothing in the language of § 5003 (a) restricts or limits the use of federal prison facilities to those state prisoners who are in need of some particular treatment.[8]

---

[7] See n. 1, *supra.*

[8] Only one Circuit has adopted the reading of § 5003 (a) urged by the petitioner. *Lono* v. *Fenton,* 581 F. 2d 645 (CA7 1978) (en banc). Each of the other Circuits to consider the meaning of § 5003 (a) has rejected the petitioner's interpretation of that provision. *Sisbarro* v. *Warden,* 592 F. 2d 1 (CA1 1979); *Beshaw* v. *Fenton,* 635 F. 2d 239 (CA3 1980); *United States ex rel. Gereau* v. *Henderson,* 526 F. 2d 889 (CA5 1976); *Fletcher* v. *Warden,* 641 F. 2d 850 (CA10 1981).

## B

When the terms of a statute are unambiguous, our inquiry comes to an end, except "in 'rare and exceptional circumstances.'" *TVA* v. *Hill,* 437 U. S. 153, 187, n. 33 (1978) (quoting *Crooks* v. *Harrelson,* 282 U. S. 55, 60 (1930)). No rare and exceptional circumstances are present here; our reading of the statute is fully supported by the legislative history of § 5003.

The petitioner disagrees. He notes that, when asked on the Senate floor to explain § 5003 (a), Senator McCarran answered that, whereas 18 U. S. C. § 4002 allows the Federal Government to contract with state officials for the confinement of federal prisoners,

> "[t]his bill would authorize a more or less reciprocal arrangement whereby, under certain conditions in a limited category of cases . . . the Attorney General may contract with State officials for the custody of persons convicted and sentenced under State laws." 97 Cong. Rec. 13543 (1951).

The petitioner finds significance in the Senator's use of the words "under certain conditions" and "in a limited category of cases."

Read as a whole, the legislative record reveals that § 5003 was enacted to provide a practical solution to a simple problem, that is, to permit the states to transfer their prisoners to federal custody in the same way that the Federal Government for years had been placing prisoners in state custody pursuant to 18 U. S. C. § 4002. Until this century, there was no federal prison system to speak of; instead, federal prisoners were housed in state prisons. By 1952, however, a sufficient number of federal prisons had been built that Congress could respond to requests from the states that the Federal Bureau of Prisons provide facilities in cases where state facilities were inadequate in some way. Section 5003 was the congressional response to this evolving situation.

A desire to help states with insufficient facilities, a sentiment that permeates the legislative history of § 5003, may be detected even in the remarks of Senator McCarran quoted by the petitioner. The Senator described the new section as a "reciprocal" of § 4002, one authorizing the Attorney General to extend *to* the states the same type of service he was authorized to receive *from* them under § 4002. Because federal officials exercise broad authority under § 4002, the "reciprocal" authority purportedly extended under § 5003 (a) likely was understood by Congress to be equally broad.

In addition to Senator McCarran's remarks, the petitioner relies heavily upon a passage in the Report of the House Judiciary Committee on the bill that was to become § 5003. The Committee stated:

> "The proposed legislation restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment. The term "treatment" as used in this bill, in addition to its ordinary meaning of providing medical care, is also meant to include corrective and preventive guidance and training as defined in the Youth Corrections Act." H. R. Rep. No. 1663, 82d Cong., 2d Sess., 2 (1952).

The petitioner's reliance upon this passage is understandable, but a single sentence—especially one taken from a Report issued five months after one chamber, the Senate, had passed § 5003—cannot obscure the unmistakable intent of Congress to create by § 5003 broad authority in federal officials to accept custody of state prisoners in the federal prisons. Indeed, nowhere is this intent clearer than in another passage from the very same page:

> "State prisons for many years housed and cared for Federal prisoners—until the Federal Government built its own institutions. Today, by [virtue of § 4002], the Attorney General is authorized to contract for the care and custody of our Federal prisoners. . . . The commit-

tee sees no reason why Federal facilities and personnel should not, in turn, be made available for State offenders, provided, of course, the Federal Government is reimbursed for any expenses involved." *Ibid.*

The legislative history of § 5003 reveals that Congress perceived a need to respond to state requests for the federal prison system to undertake "custody, treatment, and training" of state prisoners where the states lacked an institutional capacity to do so themselves. S. Rep. No. 978, 82d Cong., 1st Sess., 2 (1951). It is clear that § 5003 was a broad response to this perceived need. Nothing in the legislative history of § 5003 makes this case one of the "rare and exceptional cases" requiring a departure from the plain language of the statute.

## C

Because the Attorney General, and through him the Bureau of Prisons, are charged with the administration of § 5003, their view of the meaning of the statute is entitled to considerable deference. *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 274–275 (1974); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). Moreover, in this case, the Bureau's interpretation of the statute merits greater than normal weight because it was the Bureau that drafted the legislation and steered it through Congress with little debate.

The contract between the United States and Vermont that served as the basis for the petitioner's transfer to federal custody is just one indication that the Federal Bureau of Prisons has construed § 5003 as broadly authorizing it to accept whatever prisoners are referred to it by state officials. In nearly 30 years of administering this statute, several Attorneys General have interpreted the statute consistently as a grant of plenary authority to contract with the states, limited only by certification that space and personnel were available.

Furthermore, Congress has had ample opportunity to express whatever dissatisfaction it might have regarding this adminis-

trative interpretation of § 5003. As early as 1952, in its Annual Report, the Bureau of Prisons advised Congress of its view of the statute:

> "[Section 5003] authorize[s] the Attorney General, when adequate facilities and personnel are available, to contract with State officials for the care and custody of State prisoners. . . .
>
> "The confinement of Federal prisoners in State institutions has been authorized since 1776. . . . The present act affords an opportunity for reciprocity which had not hitherto existed. While it is not anticipated that the new statute will be used widely, States may on occasion wish to request Federal care for particular prisoners who need facilities available in the Federal prison system but not in their own. For example, *a State may wish to transfer a vicious intractable offender who cannot be handled readily in its own institutions,* or a female prisoner for whom appropriate facilities are not available, or a prisoner needing special medical or psychiatric care." U. S. Dept. of Justice, Annual Report of the Bureau of Prisons 16–17 (1952) (emphasis added).

Congress indicated no reservation or objection to this interpretation of § 5003 in 1952, or in any year thereafter. Furthermore, in 1965, when Congress added § 5003 (d) so as to include the Canal Zone within the purview of § 5003, the Senate Report expressly described § 5003 (a) as broadly permitting the transfer of persons convicted in the Canal Zone to federal prisons. S. Rep. No. 799, 89th Cong., 1st Sess., 2 (1965).

The contemporaneous and uniform construction of § 5003 (a) by the agency that proposed its enactment and is charged with its enforcement has been that the statute authorizes contracts based upon a broad range of purposes, including the transfer shown by this record. In the absence of any evidence

of congressional objection, the agency's interpretation must be given great weight.

## IV

The plain language, the legislative history, and the long-standing administrative interpretation of § 5003 (a) clearly demonstrate that the provision is a broad charter authorizing the transfer of state prisoners to federal custody. There is no basis in § 5003 (a) for the petitioner's challenge to his transfer to federal custody. Given our disposition of this issue, it is unnecessary to address the other arguments made by the petitioner.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEWART dissents. He would vacate the judgment and remand the case to the District Court with directions to dismiss the complaint. He is of the view that, although the petitioner could have brought a habeas corpus action in the appropriate Federal District Court by virtue of 18 U. S. C. § 4001 (a), neither that statute nor any other authorized this independent civil action in the United States District Court for the District of Vermont.

JUSTICE STEVENS, concurring in the judgment.

As I read 18 U. S. C. § 5003 (a), quoted *ante,* at 475, n. 1, it authorizes the Federal Government to take custody of state prisoners only "under certain conditions in a limited category of cases." [1] The history of the legislation indicates that it was intended to authorize the use of federal "treatment facilities," that would not otherwise be available to the States, for the custody and treatment of "those convicted State of-

---

[1] Those were the words used by the Chairman of the Senate Judiciary Committee in explaining the purpose of the bill that became § 5003. See 97 Cong. Rec. 13543 (1951).

fenders who are in need of treatment." [2]  The language of the statute is consistent· with this purpose.  The requirement of a federal certification "that proper and adequate treatment facilities and personnel are available" surely is inconsistent with the view that nothing more than adequate prison accommodations are necessary to justify the transfer of a state prisoner to the federal system.

In this case, however, petitioner presented the State of Vermont with the kind of problem that the federal statute was intended to solve.  Petitioner's classification as an espe-

---

[2] That is the language in the Report of the House Judiciary Committee. H. R. Rep. No. 1663, 82d Cong., 2d Sess., 2 (1952) (House Report). That Report made it clear that the word "treatment" had been purposefully selected as a limitation upon the authority of the Bureau of Prisons to accept state prisoners into federal custody:

"Frequently, State officials request the Bureau of Prisons to undertake the custody, treatment, and training of State prisoners where specialized types of institutions and training programs are indicated but are not available in the States.  These requests usually relate to juveniles and drug addicts, concerning whom many of the States are without satisfactory institutions and training programs.  The Bureau of Prisons points out that it now has Federal facilities available, including medical and administrative personnel, to accommodate those State offenders that are in need of the various types of treatment that Federal institutions are providing.

.        .        .        .        .

"The proposed legislation restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment. The term 'treatment' as used in this bill, in addition to its ordinary meaning of providing medical care, is also meant to include corrective and preventive guidance and training as defined in the Youth Corrections Act (sec. 5006g, title 18, U. S. C.)."  *Id.,* at 1, 2.

Attached to the House Report was a letter from the Deputy Attorney General supporting the proposed legislation.  The Deputy Attorney General's understanding of the purpose of § 5003 was the same as that of the House Judiciary Committee.  See House Report, at 3.  The same letter was attached to and quoted in the Senate Report accompanying the bill that became § 5003.  See S. Rep. No. 978, 82d Cong., 1st Sess., 1–2 (1951).

cially dangerous offender, together with the closing of Vermont's only maximum-security facility, created a sufficiently unusual situation to cause his transfer to the federal system to fall within the limited category that the statute covers.[3] I therefore concur in the Court's judgment, but I do not share its opinion that Congress intended to give the Federal Bureau of Prisons *carte blanche* to rent out to the States any federal prison accommodations that may be available from time to time.[4]

---

[3] Cf. *Anthony* v. *Wilkinson,* 637 F. 2d 1130, 1140 (CA7 1980) ("[E]ven something so far removed from traditional notions of 'treatment' as high security incarceration, with the opportunity to participate in attendant religious, educational, recreational and other programs, in particular cases may satisfy § 5003"), cert. pending, No. 80–1315.

[4] I essentially agree with the Seventh Circuit's interpretation of the statute:

"It was not intended by Section 5003 to put the federal government in the rent-a-prison business unless there was some special treatment need with which the state required assistance. Absent that special need the states were left to care for their own." *Lono* v. *Fenton,* 581 F. 2d 645, 648 (1978) (en banc).

In itself this case is not terribly important, but it is another example of the easy way in which the Executive Branch and this Court cooperate in the continuing transfer of governmental responsibilities from the States to the federal sovereign.