UNITED STATES of America,
Plaintiff–Appellant,

v.

ONE BELL JET RANGER II HELICOP-
TER, Identification No. N8190j (Reg-
istered to Sam Jaksick, 1013 Lakeshore
Drive, Indian Village, Nevada), Defen-
dant,

and

Great Western Helicopters, Inc.,
Claimant–Appellee.

No. 89–35551.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 1990.

Decided Sept. 3, 1991.

John A. Bryson, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Brian T. Butler; Michael J. Hemovich, Hemovich, Nappi, Oreskovich & Butler, Spokane, Wash., for defendant-appellee.

Before FLETCHER, FARRIS and BOOCHEVER, Circuit Judges.

FLETCHER, Circuit Judge:

The United States appeals the denial of forfeiture of a helicopter allegedly used to harass big horn sheep in violation of the Airborne Hunting Act ("AHA"), 16 U.S.C. 742j–1. The government argues that the district court erred by (1) requiring a showing of specific intent to harass wildlife in a civil forfeiture proceeding, (2) refusing to use the definition of harass promulgated by the agency authorized to implement the statute, (3) finding that there was no harassment of sheep, and (4) holding that

the forfeiture provision of the AHA is subject to judicial discretion. The government also requests that the Court find that a violation of the AHA occurred and order forfeiture of the helicopter rather than remand the case to the district court.

Because we agree with the district court that imposition of forfeiture is discretionary and find that this discretion was not abused, we affirm.

## PROCEEDINGS BELOW

Prior to these proceedings, Sam Jaksick, Michael Boyce, and Chris Christensen were charged with conspiring to violate both the Airborne Hunting Act, 16 U.S.C. 742j–1 and the Lacey Act Amendments of 1981, 16 U.S.C. 3372(a)(2)(A). Christensen also was charged with three counts of knowingly using a helicopter to harass bighorn sheep in violation of the AHA, 16 U.S.C. 742j–1(a)(2) and Jaksick and Boyce were each charged with four counts of knowingly using a helicopter to harass bighorn sheep in violation of the AHA, 16 U.S.C. 742j–1(a)(2). The district judge presiding over the criminal case dismissed the conspiracy charge and all but two counts against each man charging harassment. A jury acquitted the defendants of these remaining two counts.

The government, still convinced that the bighorn sheep had been harassed by the hunters, then brought this forfeiture action pursuant to 16 U.S.C. 742j–1(e). This section provides in relevant part that "all guns, aircraft, and other equipment used to aid in the ... harassing of any bird, fish, or other animal in violation of this section or of any regulation issued hereunder shall be subject to forfeiture to the United States."

After a bench trial the district court denied the forfeiture. The court articulated three alternative bases for its ruling, all of which the government now challenges. The district court ruled that:

1) the civil forfeiture section of the AHA requires a showing of specific intent to harass wildlife which the government failed to prove;

2) the bighorn sheep were not harassed by the helicopter flights;

3) the forfeiture provisions of the AHA were subject to the discretion of the court, and, given the facts of this case, forfeiture would not be appropriate.

## FACTS

In the spring of 1987 Sam Jaksick, sole shareholder of Great Western Helicopters, Inc., owner of the helicopter involved in this case, successfully bid $57,000 for a license to hunt a bighorn sheep in Oregon. Jaksick was assisted by Michael Boyce, his friend, taxidermist, and hunting companion. In order to track down the biggest and best ram possible, Boyce contacted Shane Brazier who had "bagged" the record trophy ram in Washington the previous year, just across the state line from Oregon. In this introductory conversation, among other things, Boyce inquired about the presence of game wardens in the area on the Washington–Oregon border where he and Jaksick planned to hunt. Boyce also told Brazier that he and Jaksick had access to a helicopter.

Brazier, who wanted a job with the Washington State Department of Wildlife, had previously assisted the agency in several investigations. His conversation with Boyce aroused his suspicion and, probably, his career ambitions as well. He contacted a special investigator with the Department of Wildlife and told the agent that he suspected Jaksick and Boyce were planning an illegal hunt. The agent told Brazier to get to know the men and to watch for illegal activities.

Brazier complied with the agent's request and planned helicopter sheep scouting expeditions with Jaksick and Boyce. The first flight occurred on August 5, 1987. Jaksick piloted the helicopter. According to Brazier's trial testimony the helicopter was used on this flight to fly in on groups of sheep and chase certain sheep that ran. He stated that the helicopter would fly within 40 to 50 yards of the sheep at times, a figure that was disputed by Boyce and Jaksick. How long the helicopter would stay on a sheep or a group of sheep was also disputed; while Brazier testified that the helicopter at times hovered for three or four minutes, Boyce asserted that the helicopter pulled away from the sheep immediately.

Boyce and Jaksick returned to the area to make additional scouting flights during the last week of August. Jaksick, wanting to get closer to the sheep than his own piloting skills would allow in the rugged canyons they were scouting, hired Chris Christensen, an expert helicopter pilot with considerable experience flying bighorn sheep surveys. Jaksick, Christensen, and Boyce made two scouting flights on August 25th. Although Brazier did not accompany the hunters on these two flights, the helicopter was observed by agents of the Washington Department of Wildlife and the U.S. Fish and Wildlife Service ("USFWS") from a distance of approximately 3–4 miles away. The agents' description of the helicopter's movement corresponded with Brazier's description of the August 5 flight.

On August 26, 1987 Jaksick, Christensen and Boyce flew an additional scouting trip, this time again accompanied by Brazier. At trial Brazier described the trip stating the helicopter scattered groups of sheep and hovered over individual sheep for several minutes. This was corroborated by wildlife agents who again observed the flights from a distance.

Christensen, who piloted the helicopter on the flights of August 25th and 26th, contested Brazier and the agents' descriptions of the flights. He admitted coming within 50 to 75 feet of the sheep but denied spending more than 30 seconds over any one animal. He asserted that he had developed flying techniques which would permit him to get quite close to the sheep without forcing them to bolt.

The government introduced as evidence a videotape of the encounters with the sheep taken by Brazier from his vantage point in the helicopter on the flights of August 5 and August 26. The district court found the videotape inconclusive due to the selectivity of the scenes actually taped and the

intermittent use of a zoom lens which prevents a viewer from knowing at what distance any particular scene was shot. The district court also completely discounted the testimony of the wildlife agents because it did not believe they could observe at their distance any harassment. This left Brazier as the government's sole witness.

## DISCUSSION

### A. *Harassment*

What it means to "harass" wildlife under the Airborne Hunting Act, 16 U.S.C. 742j-1, is a question of first impression. Congress passed the Airborne Hunting Act in 1971 primarily in response to public outcry over the slaughter of wolves, eagles, and other wildlife being shot from aircraft. S.Rep. No. 92-421, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News, p. 1735, at 1736-37. The AHA imposes criminal penalties on any person who "while airborne in an aircraft shoots or attempts to shoot for the purpose of capturing or killing any bird, fish or other animal" 16 U.S.C. 742j-1(a)(1). The AHA also imposes criminal penalties on any person who "uses an aircraft to harass any bird, fish, or other animal." 16 U.S.C. 742j-1(a)(2).

The AHA, as passed in 1971, contained no provisions authorizing implementation or enforcement. In 1972 Congress adopted amendments to the AHA (Pub.L. No. 92-502) delegating enforcement responsibility to the Secretary of the Interior and authorizing the Secretary to "promulgate such regulations as he deems necessary and appropriate to carry out such enforcement." 16 U.S.C. 742j-1(d). The 1972 amendments also added a provision making all animals taken and all aircraft, guns or other equipment used in violation of the statute subject to forfeiture to the United States. 16 U.S.C. 742j-1(e).

The U.S. Fish and Wildlife Service ("USFWS") of the Department of the Interior promulgated implementing regulations which included the following definition of harass:

Harass means to disturb, worry, molest, rally, concentrate, harry, chase, drive, herd or torment.

50 C.F.R. 19.4.

In deciding that no harassment occurred, the district court refused to use the definition of "harass" employed in 50 C.F.R. 19.4 by the U.S. Fish and Wildlife Service, the agency ultimately charged with administering the AHA. Instead, the court adopted the definition of harass used in the instructions to the jury in the criminal trial: "to molest, or chase, or harm, or torment." ER 39.

■■ The Fish and Wildlife Service definition, "to disturb, worry, molest, rally, concentrate, harry, chase, drive, herd, or torment" is a reasonable definition which clearly advances the purposes of the statute. Where regulations promulgated under the authority of statute are reasonable and do not conflict with the statutory purpose, courts must defer to the expertise of the agency promulgating the regulations. *Chemical Manufacturers Association v. NRDC*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107-08, 84 L.Ed.2d 90 (1985); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). Although the district court employed what it termed a "more succinct" statement of the USFWS definition, there was no claim or finding that the USFWS definition of harass is inaccurate, unreasonable or in conflict with the purpose of the statute. It is the definition that the district court should have applied.

■ Although we might question the district court's decision to exclude or discount virtually all of the government's evidence, we need not do so here since we find that the overwhelming preponderance of the evidence, particularly the testimony of the claimant's own witnesses, Jaksick, Boyce, and Christensen, whom the district court found most credible, established that the sheep were at various times driven, concentrated, chased, or otherwise harassed. Although Mr. Christensen testified he had developed and used a flying technique that is less harmful to sheep than the traditional method used in wildlife surveys, it none-

theless had an effect on the sheep. The substance of Mr. Christensen's testimony was that his method of getting close to a sheep without making it run depended on either first driving the sheep to cover, or alternately, catching the sheep exposed on a ledge and then hovering at such an angle that the animal could not get away whether it moved forward or retreated. The fact that the flying technique may be appropriate in executing necessary government sanctioned wildlife management activities, which are exempt from the AHA, does not mean that it is not harassing, only that it is less stressful than some other methods.

Boyce is heard on a tape recording that was introduced into evidence saying in reference to the August 25th flight, "[w]e ran the shit out of that [ram] yesterday." The record also is replete with unrebutted testimony of close encounters with the sheep for varying lengths of time although the exact time of hover and distance from the sheep is disputed. It is uncontroverted that the helicopter repeatedly came within 50 feet of bighorn sheep—close enough that the rotor wash was blowing on the sheep and the bushes and dirt around the sheep. Some of the sheep reacted by running away; some of the sheep reacted by running for cover; and some of the sheep reacted by trying to hide. The District Court quite properly found from evidence in the record that "some sheep were affected in some manner" by the helicopter.

(Memorandum and Order, July 7, 1989, p. 17.) Under either definition, the court's or that of the USFWS, the sheep were harassed[1] ("chased" within the literal wording of the court's definition and were "disturbed, worried, rallied, concentrated, chased, driven, or herded" within the USFWS definition).[2] Thus the record evidence and the court's findings can support no conclusion but that the sheep were harassed. Keeping in mind the claimant's burden in this civil forfeiture proceeding to disprove the Government's case by a preponderance of the evidence, we conclude that the district court's finding that no harassment occurred was clearly erroneous.

### B. *Intent*

█ The record makes it clear that the occupants of the helicopter, all of whom had extensive experience scouting or hunting bighorn sheep, knew that the sheep would react to close contact with the helicopter by running away or running for cover. Despite their knowledge that such contact would disturb the sheep, the occupants of the helicopter purposefully engaged in extremely close contacts with the sheep. Jaksick and Boyce were attempting not only to locate sheep with the helicopter,[3] they were intent on getting absolutely as close to the sheep as possible so that they could identify the best trophy ram.[4]

1. We note that a definition of "harass" that includes observable harm to the animals or requires a showing of physiologically measurable stress would be substantially different than the USFWS definition. It appears the district court may have had in mind this more restrictive meaning. We glean this from various of its remarks and the *exclusions* of many of the terms in the USFWS definition of "harass" (disturb, worry, rally, concentrate, harry, drive, herd). If this were the case, it would constitute reversible error under *Chemical Manufacturers Association* and *Chevron, supra.* Neither the statute nor the regulations require a showing of harm or stress. We agree with the government that Congress specifically chose the word "harass" because it sought to proscribe activity which did not necessarily cause measurable harm or injury.

2. We note that the record is replete with evidence that the instinctive escape response of bighorn sheep is to head uphill and away from

danger. (Tr. 274, 344, 374, 403, 411, 475, 844, 861, 864) This evidence strongly suggests that animals such as mountain goats and bighorn sheep that have evolved over the millennia to survive by climbing up and away from danger in treacherous terrain are likely to be especially sensitive to intrusions from aircraft.

In ruling that no harassment occurred, the district court seems to have placed great weight on the fact that it is natural and to be expected that wild animals will react to the intrusion of a foreign object such as a helicopter. This is not a basis for ruling that the statute was not violated.

3. The legality of using aircraft to scout or locate wildlife, when done at an appropriate distance, was not challenged.

4. In light of the testimony of Christensen (Tr. 614, 617–18, 628) and Jaksick (Tr. 827) that their chief purpose was to locate a trophy ram,

In addition, no rebuttal was offered to the testimony that Boyce can be heard on a tape recording of the August 26th flight saying "[w]e ran the shit out of that [ram] yesterday."

This evidence of knowledge and purpose of the occupants in their use of the helicopter is sufficient to satisfy any intent requirement that might be read into the statute. Thus we need not decide whether or not specific intent to harass is required for a civil forfeiture under the AHA.

### C. *Discretion to Deny Forfeiture*

Finally, we reach the question of whether the district court was correct in its alternative basis for its ruling that, regardless of its other findings, it had discretion to deny forfeiture under the AHA. The wording of the AHA [5] and its legislative history make it clear that the imposition of forfeiture by the court is discretionary. S.Rep. No. 92–1157, 92d Cong., 2nd Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News, pp. 3835, 3837. The wording of the original proposed legislation made forfeiture mandatory. The amendment that was adopted making forfeiture discretionary was recommended by the Department of the Interior, the agency charged with implementing and enforcing the act. The Department advised the Senate that the amendment was intended "to confer *upon the courts* discretion to determine whether or not forfeiture of animals taken or equipment used in violation of the Act is appropriate in a particular case." S.Rep. No. 92–1157, 92d Cong., 2nd Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News, p. 3839 (emphasis added). The interpretation of the agency charged with administering the statute is entitled not only to "considerable deference", but to "greater than normal weight" when that agency drafts the legislation and steers it through Congress with little debate. *Howe v. Smith,* 452 U.S. 473, 485, 101 S.Ct. 2468, 2476, 69 L.Ed.2d 171 (1980). Here, although the agency in this particular proceeding now urges that the discretion is the agency's, not the court's, we defer to the statement made to Congress by the agency at the very time it presented its own amendment to the Congress as one it urged for adoption, as the more reliable.

 We agree with the district court that the statute confers upon the courts discretion to deny forfeiture. Having come to this conclusion, we review for abuse of discretion. This court finds an abuse of discretion when it has a definite and firm conviction that a clear error of judgment was committed by the lower court. *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334, 1337 (9th Cir.1985).

 The district court was justifiably disturbed by the conduct of the government during the investigation and prosecution of this case. The court found that Jaksick and Boyce repeatedly expressed their desire for a legal hunt, that Jaksick had sought and procured a $57,000 license to hunt a bighorn sheep, that any illegal behavior could have been prevented by informing the hunters about the law, that the undercover government informant overzealously attempted to inculpate the hunters, that the videotape was shot selectively to cast the hunters in the worst possible light, and that the investigation was an inefficient and wasteful use of resources. In a footnote to its order, the district court stated its belief that even if one were to assume for the sake of argument that harassment had occurred, Brazier and not the other occupants of the helicopter was to blame. Indeed, Brazier seems to have shown remarkably little concern for either the welfare of the sheep or the integrity of the law.

The government arrested Boyce and Jaksick on a Saturday when they could not readily be brought before a magistrate

---

the district court's finding that "any contact with the sheep was merely incidental and not intended" was clearly erroneous.

**5.** 16 U.S.C. 742j–1(e) in pertinent part reads: "all guns, aircraft, and other equipment used to aid in the ... harassing of any bird, fish, or other animal in violation of this section or of any regulation issued hereunder *shall be subject to forfeiture* to the United States." (Emphasis added).

and, despite the fact that they were neither dangerous nor posed a risk of flight, held them in jail for two days on misdemeanor charges until they could be arraigned. Upon arrest Jaksick was handcuffed and on the way to jail forced to eat his lunch in a restaurant with his hands cuffed to his waist. At the jail, Boyce was denied the opportunity to call his wife until after he had been interviewed for approximately two hours. Finally, despite a court order requiring disclosure and discovery issued several months prior to the commencement of the criminal trial, the government failed to disclose that Brazier was a paid informant and the defendants did not learn of the payments made to Brazier until they were permitted to take his deposition on the day the jury was selected.

Although it may be that Jaksick, Boyce and Christensen were not without blame [6], the government's treatment of these men was completely unwarranted. The district court also took into consideration the fact that they had already been put through considerable trouble and expense defending themselves against both the civil and criminal suits. We also note that this is a case of first impression as to the meaning of "harass" in the context of this statute. Although ignorance of the law is no excuse, when the court has discretion as to whether in a civil proceeding to impose a harsh penalty, in assessing culpability, it may take such factors into consideration. Given these considerations and the conduct of the government in this case, we hold that the district court did not abuse its discretion in denying forfeiture of the helicopter.

## CONCLUSION

Although we find that harassment occurred and that the occupants of the helicopter demonstrated an intent to harass within the meaning of the statute, the judgment of the district court denying forfei-

ture of the helicopter is AFFIRMED on the district court's alternative ground that the discretion to deny forfeiture conferred upon the court by the statute was not abused.

AFFIRMED.

FARRIS, J., concurs only in the result.

---

**6.** We note that harassment of the sheep occurred during at least one flight where Brazier was not present and had no influence on the conduct of the others—indeed this was the flight that Boyce was describing when he was record-

ed saying "we ran the shit out of that [ram] yesterday."

