Michelle HASSAN, on her own behalf
and as next friend of Adam Hassan
and Joseph Hassan, Plaintiff,

v.

Phil BRADLEY, in his official capacity
as Director of the Illinois Department
of Public Aid, Defendant.

Frances DIAZ, on her own behalf and as
next friend of Emilio Aquirre, Yolanda
Rodriguez and Ricardo Ramirez, Plain-
tiff,

v.

Phil BRADLEY, in his official capacity
as Director of the Illinois Department
of Public Aid, Defendant.

Nos. 91 C 2423, 91 C 2813.

United States District Court,
N.D. Illinois, E.D.

March 30, 1993.

Gary H. Palm, Catharine MacCarthy, Joseph P. McHugh (Sr. Law Student), Edwin F. Mandel, Legal Aid Clinic, Chicago, IL, for plaintiffs.

Karen Konieczny, Sp. Asst. Atty. Gen., Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff, Michelle Hassan, and her children, Joseph Hassan and Adam Hassan, are recipients of Aid to Families with Dependent Children (AFDC). The Hassan family receives a monthly AFDC grant of $330.00 from the Illinois Department of Public Aid (IDPA). The grant is $481.00 short of the standard of need for a family of three, which was $811.00 per month at the time the complaint was filed. Plaintiff, Frances Diaz, and her children, Emilio Aquirre, Yolanda Rodriguez and Ricardo Ramirez, receive a monthly AFDC grant of $414.00, which is $500.00 short of the $914.00 standard of need for a family of four. In 1975, Illinois paid AFDC grants equal to the standard of need.

As the adjudicated father of Joseph Hassan, Emanuel Shamoon is required to pay child support in the amount of $150.00 per month. Ricardo Ramirez's father, Gabriel Ramirez, is also required to pay child support in the amount of $90.00 per month. The IDPA requires both plaintiffs to assign their child support to the state as a condition of receiving AFDC grants. When the IDPA receives these monthly child support payments, it pays the first $50.00 to plaintiffs without any effect on their AFDC eligibility. The remainder of the payments are retained by the IDPA, which in turn pays a portion of the excess to the federal government.

Defendant Phil Bradley, the Director of the IDPA, has moved for summary judgment in both related cases. Count I of each complaint alleges that plaintiff should be allowed to keep her child support to fill the gap between the grant amount and the standard of need pursuant to 42 U.S.C. § 602(a)(28). Count II alleges that plaintiff's due process rights are violated by the IDPA's requirement that child support be assigned to the state as a condition of receiving public assistance when that assistance is significantly below the established standard of need.

To prevail on a motion for summary judgment, defendant must show that no genuine issue of material fact is in dispute and that he is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where genuine issues of material fact exist, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Because the parties are in agreement as to the essential facts of this case, the court must decide whether defendant is entitled to judgment as a matter of law.

## I. *OVERVIEW OF SECTION 602(a)(28)*

The AFDC program is a federal-state cooperative effort administered by the states. It was established to "encourag[e] the care of dependant children.... to help maintain and strengthen family life and to help such parents and relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection...." 42 U.S.C. § 601. The AFDC program provides assistance to families deprived of the support of one parent through death, illness, mental incapacity or, in some states, unemployment. 42 U.S.C. §§ 606, 607. Families are eligible for AFDC assistance if their "countable income"[1] falls below a "standard of need"[2] established by the state, resulting in a "budget deficit."[3]

---

1. "Countable income" is income minus such items as the costs incurred in earning the money, *e.g.*, day care expenses. *See* 45 CFR § 233.-20(a)(7).

2. "Standard of need" is that amount of money determined to be necessary for subsistence for a family of a given size.

3. The "budget deficit," therefore, is that amount by which a family's monthly income falls short of that minimum sum, the "standard of need," deemed necessary for the family's subsistence.

In 1975, most states provided AFDC payments sufficient to cover the full amount by which a family's income fell below the established standard of need. Illinois was one such state. However, twelve states and Puerto Rico [4] did not provide full budget deficit payments which left a gap between the family's resources and the standard of need. These states were called "gap states." See 42 U.S.C. § 602(a)(28).

Before 1975, child support payments received by a family in a given month were included in "countable income" for that month for the purposes of determining the family's eligibility for AFDC. If the family's earnings, plus any child support received, exceeded the "standard of need," the AFDC parent would be ineligible for assistance that month. In 1975, the law was amended to provide that child support payments would no longer be included in countable income. Instead, the state could require individuals to assign to the state their rights to child support payments as a condition of AFDC eligibility, 42 U.S.C. § 602(a)(26). The state was authorized to retain these child support payments collected "as reimbursement for any past assistance payments made to the family for which the State has not been reimbursed...." 42 U.S.C. § 657(b).

The collection and distribution by the state of child support payments so assigned is governed by the Child Support Enforcement Act (CSE), 42 U.S.C. §§ 651–666, Title IV–D of the Social Security Act. The CSE program is designed both to assist parents in collecting child support from absent parents and to reduce state and federal government AFDC expenditures, which are often necessitated by the failure of noncustodial parents to meet their support obligations. All states participating in the AFDC program are required to have child support collection programs, 42 U.S.C. § 602(a)(27), through which they assist families in establishing paternity, locating parents and collecting support through wage withholding, liens on property and withholding from unemployment compensation and tax refunds. 42 U.S.C. §§ 654, 664, 666.

In states such as Illinois, in which the AFDC payment was sufficient to make up the full difference between the family's countable income and the standard of need, the 1975 amendment providing for the assignment of support payments to the state did not make a difference in the family's resources. In such states, support payments received directly by the family would have reduced dollar-for-dollar the amount of the AFDC payment. In "gap states," which did not provide a dollar-for-dollar payment of the budget deficit, support payments received directly by the family prior to 1975 could be used to fill the gap between the family's resources (including the AFDC grant) and the standard of need, without reducing the AFDC payment. In those states, the assignment of support payments to the state under the IV–D scheme would mean that the funds would be used to reimburse the AFDC payments made by the state, whether or not the family reached the state's minimum standard of need. Thus, AFDC families in "gap states" would lose disposable income under the reimbursement provisions.

Realizing that AFDC families in "gap states" could be worse off under the CSE program, Congress enacted 42 U.S.C. § 602(a)(28), providing that child support collected by the state should be used as supplemental AFDC payments to fill the gap between the standard of need and the state's actual monthly AFDC payment standard. According to 42 U.S.C. § 602(a)(28), in a gap state, collected child support must first be used to fill the gap before such funds may be used to reimburse the state and federal governments for AFDC payments.

## II. *ANALYSIS OF SECTION 602(a)(28): LEGISLATIVE INTENT*

 If sufficiently clear in its context, the language selected by Congress must be given effect, *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Earnst & Earnst v. Hochfelder*, 425 U.S. 185, 200–01, 96 S.Ct. 1375, 1384–85, 47 L.Ed.2d 668 (1976), unless

---

**4.** The twelve "gap" states were: Arizona, Arkansas, Georgia, Indiana, Maine, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, Virginia, and Wyoming. *See Quarles v. St. Clair,* 711 F.2d 691, 694 (5th Cir.1983).

the result thereby reached is unequivocally contrary to congressional intent or statutory policy. *In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *United States v. Campos–Serrano,* 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971). It is necessary to examine the statutory language of the specific provision at issue. Section 602(a)(28) requires that state AFDC plans:

> provide that, in determining the amount of aid to which an eligible family is entitled, any portion of the amounts collected in any particular month as child support pursuant to a plan approved under part D of this subchapter and retained by the State under section 657 of this title, which (*under the State plan approved under this part as in effect both during July 1975 and during that particular month* ) would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family, shall be added to the amount of aid otherwise payable to such family under the State plan approved under this part; (emphasis added).

42 U.S.C. § 602(a)(28). The parties agree that this section was intended to require "gap states" to take into account the amounts collected in any particular month as child support and to return to the AFDC family that portion of those amounts which would fill the gap to the point of ineligibility, i.e. one dollar less than the standard of need. The parties disagree, however, on whether this section requires Illinois, which is currently a "gap state," to fill eligible families' budget deficit with child support.

Defendant argues that under the plain language of Section 602(a)(28), the amount of child support to be added to the AFDC grant is limited to the amount of child support which " ... under the State plan approved under this part as in effect *both* during July, 1975 *and* during that particular month would not have caused a reduction in the amount of aid paid to the family ..." (Emphasis added). Defendant maintains that Congress' use of the words "both" and "and" requires that in order to compel the State to pay over its IV–D child support collections to the AFDC family, or to permit the retention of other income up to the standard of need, it must be

demonstrated that the State permitted gap filling with child support both in July, 1975 and under its current State plan. This court agrees with the Defendant's construction of Section 602(a)(28).

■ It is a familiar rule of statutory construction that Congress is presumed to have used words according to their ordinary meaning. *Avery v. C.I.R.,* 292 U.S. 210, 214, 54 S.Ct. 674, 676, 78 L.Ed. 1216 (1934). Clear statutory terms, however succinct, should be read to mean what they say. See *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171 (1981). Congress' use of "both" and "and" is not ambiguous within the context of Section 602(a)(28). Under the plain meaning of these words, it must be shown that the State, as a matter of fact, permitted gap-filling with child support in 1975 and at present. Illinois did not permit gap-filling in 1975 and it was not considered a "gap state."

Plaintiffs argue that Section 602(a)(28) is applicable to Illinois today and requires the IDPA to allow families to use child support to fill the gap between their AFDC grants and the standard of need. Plaintiffs' rationale is that Section 602(a)(28) applies to all states that allowed gap-filling in 1975, whether or not a gap actually existed in 1975. This construction of Section 602(a)(28) is unpersuasive.

The applicability of Section 602(a)(28) depends upon the unique features of the AFDC program in each state. States which actually permitted gap-filling in 1975 were required to make an upward adjustment of AFDC grant payments to compensate for the lost income to those families. Illinois, in 1975, did not permit gap-filling, rather the IDPA treated child support as non-exempt income for the purpose of determining eligibility for and the level of payment of AFDC cash benefits. Child support received and retained by an AFDC family reduced the AFDC cash grant on a dollar for dollar basis. Child support received by Illinois families on AFDC caused a reduction in the amount of

aid paid to the families. In 1975, Illinois did not permit gap-filling nor was it a gap state. Therefore, IDPA is not within the purview of Section 602(a)(28).

The legislative history of the 1975 amendments reinforces this court's interpretation of Section 602(a)(28). The IV–D program was conceived upon congressional realization that the problem of welfare dependency, including the steadily rising cost of the AFDC program, was caused in part by absent parents who did not pay adequate child support. See S.Rep. No. 93–1356, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News, 8133, 8145–46. Congress therefore sought to enact legislation which would encourage the state to collect these hitherto unenforced child support obligations. To this end, the IV–D program mandated that paternity and child support enforcement services be provided by the states to all AFDC recipients. 42 U.S.C. § 654(4). Further, among other things, the Act made it permissible for the States to require the assignment of support obligations to the state as a prerequisite to AFDC eligibility. 42 U.S.C. § 602(a)(26).

After passage of the amendments in 1975, Congress became concerned with the viability of several provisions of the Act and decided to undertake further study of the law. The effective date of the Act was thus moved ahead one month to August 1, 1975.[5] One of the problems occasioning the delay was a congressional realization that "because of maximums in a *few states* in the amount of aid payable, certain recipients having child support income would lose some disposable income when [the IV–D program] was implemented." United States Senate, Committee on Finance, Child Support Data and Materials, 94th Cong., 1st Sess. 4–5 (Nov. 10, 1975) (Emphasis added).

In discussing Section 602(a)(28), Representative Corman said: "This legislation is needed prior to August 1 because of serious problems regarding the implementation of the program which would result if the law goes into effect on that date without amendment," including:

> [One] problem the committee found was that after August 1, many families in 12

states plus Puerto Rico will suffer reduction in their total income. Those 12 States are: Arizona, Arkansas, Georgia, Indiana, Maine, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, Virginia, and Wyoming. Some States have been unable to provide AFDC payments as large as the amounts that are recognized to be needed by families.

> This frequently results in a gap which the State permits to be filled by private income, in this instance, child support from the absent father. Since under the new child support program the support payments are made directly to the State or local welfare agency instead of to the family, there is a resulting reduction in the family's total income. Therefore, the committee's bill would require that the State shall increase its assistance payments to the family to compensate for this loss.

121 Cong Rec H23696 (Daily ed July 21, 1975) (remarks of Rep. Corman). Additionally, when the Senate discussed Section 602(a)(28), Senator Long explained the purpose as: "The amendment as modified would permit States which *now* allow recipients to keep a portion of the child support payments they receive, to continue to do so in order to prevent a reduction of income by recipients." 121 Cong Rec S26754 (Daily ed August 1, 1975) (emphasis added).

This court finds that the legislative history of Section 602(a)(28) supports our interpretation that Congress intended to limit Section 602(a)(28) to those states which were "gap states" in 1975. Congress realized that in those states where AFDC benefit schedules left a "gap" between recipients' resources and their standard of need, the assignment and *retention* of child support by these states would leave AFDC recipients financially worse off than before the Act's passage. Because Illinois was not a gap state in 1975, Plaintiffs cannot bring themselves within the ambit of Section 602(a)(28). Accordingly, Defendant's motion for summary judgment is granted with respect to Count I of the Complaint.

---

**5.** This was done on June 30, 1975, by Pub.L. No. 94–46, § 2, 89 Stat. 245 (1975).

## III. *DUE PROCESS*

██ Plaintiffs further argue that Illinois violated their substantive due process rights by requiring them to assign their child support rights to the state when public assistance is less than the established standard of need. However, the due process clause confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests which the government itself may not deny. *Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1776, 114 L.Ed.2d 233 (1991); *DeShaney v. Winnebago Social Services,* 489 U.S. 189, 195–96, 109 S.Ct. 998, 1002–03, 103 L.Ed.2d 249 (1989). Additionally, there is no fundamental federal right under the United States Constitution to receive welfare benefits, and neither the State nor federal governments are under any sort of constitutional obligation to guarantee minimum levels of support. *Dandridge v. Williams,* 397 U.S. 471, 485–87, 90 S.Ct. 1153, 1161–63, 25 L.Ed.2d 491 (1970).

██ It has long been established that due process demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. See *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket. *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972). Illinois' assignment of child support obligations is clearly rational and thus not violative of the federal constitution. See *Bowen v. Gilliard,* 483 U.S. 587, 596–603, 107 S.Ct. 3008, 3014–18, 97 L.Ed.2d 485 (1987). Accordingly, Defendant's motion for summary judgment on count II is granted.

ORDERED: Defendant's motion for summary judgment in both related cases is granted. In each case, the Clerk is ordered to enter judgment for defendant and against plaintiff pursuant to FRCP 58.