United States Court of Appeals,

Fifth Circuit.
No. 94-60432.

INSTITUTE FOR TECHNOLOGY DEVELOPMENT, Plaintiff-Appellant,

v.

Ronald H. BROWN, Secretary of Commerce, et al., Defendants-Appellees.

Sept. 13, 1995.

Appeals from the United States District Court for the Southern District of Mississippi.

Before VAN GRAAFEILAND,[*] E. GRADY JOLLY and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal raises the somewhat technical, yet fact specific question of whether this recipient of federal grants can claim depreciation as an allowable substitute cost. Although somewhat repetitious with other parts of this opinion, the recital of some background initially will place in context the issue we consider.

The Public Works and Economic Development Act bestows on the Secretary of Commerce the authority to make grants for economic development upon application of any state. 42 U.S.C. § 3131(a) (1977). Mississippi sought federal funds to create a nonprofit organization—the Mississippi Institute for Technology Development ("ITD")—to establish university-affiliated research centers throughout the state to conduct and to transfer scientific research into useful commercial applications. The Mississippi Board of Economic Development had approved a plan for the establishment of

---

[*]Circuit Judge of the Second Circuit, sitting by designation.

ITD, and the state's government, business, and academic leaders had agreed to fund half of the capitalization of ITD. S.REP. NO. 206, 98th Cong., 1st Sess. 8 (1983). In response to Mississippi's efforts, the United States Senate Committee on Appropriations, on August 2, 1983, considered the proposal by Mississippi that the federal government contribute funds toward the establishment of ITD. S.REP. NO. 206 at 7. Thereafter, the Committee appropriated funds to the Economic Development Administration ("EDA")—an agency within the Department of Commerce—to conduct a feasibility study (the "Study") of Mississippi's proposal and deferred committing federal funds to support ITD until completion of the Study. *Id.* On March 30, 1984, the independent research firm hired to conduct the Study submitted its results to the Senate, the House of Representatives, and EDA. The Study discussed in detail the feasibility and potential of ITD, the positive economic contributions that would result from ITD's creation and operation, and the required funding of ITD. Because of the Study's optimistic predictions, the Committee recommended that Congress appropriate a maximum of twenty million dollars over a four-year period to EDA for the establishment of ITD. S.REP. NO. 570, 98th Cong., 2d Sess. 9 (1984).

After Congress appropriated these funds to EDA, EDA distributed the money to ITD in five separate grants. H.R.REP. NO. 6040, 98th Cong., 2d Sess. (1984). After EDA distributed four of these five grants, the Office of the Inspector General conducted an audit of the grants and recommended that certain costs improperly

spent under the grants be disallowed. EDA subsequently accepted this recommendation and disallowed a portion of the costs charged against the federal funds. Applicable regulations, however, provided that when claimed expenses were disallowed, a grantee, such as ITD, could substitute and claim reimbursement for other previously unclaimed "allowable" expenses it may also have incurred in the operation of the sponsored project. Pursuant to these regulations, ITD sought reimbursement for some of the depreciation expenses it had incurred, but had not initially claimed for reimbursement under the grants. EDA rejected the claim for reimbursement under the first four grants. ITD then appealed the decision of EDA to the Assistant Secretary for Economic Development, who also rejected ITD's depreciation costs, finding reimbursement for depreciation inconsistent with the purpose and terms of the grants. ITD next filed for review in the district court, which affirmed the decision of the Assistant Secretary.

With regard to the fifth and final grant, EDA disallowed various costs, which ITD appealed to the Assistant Secretary. In the administrative appeal, however, ITD did not claim depreciation as a substitute cost. Nevertheless, ITD attempted to raise this claim for depreciation as an allowable substitute cost before the district court. Here, ITD argues that because applicable regulations recognize depreciation as an allowable substitute cost, the district court erred in granting summary judgment in favor of EDA with respect to all five grants. After examining the Grant Agreements between EDA and ITD, the congressional intent underlying

3

these grants, and the provisions of the Study, we hold that the district court erred in affirming the decision of the Assistant Secretary regarding the first four grants. Accordingly, as to these four grants, we reverse and remand for proceedings not inconsistent with this opinion. Because ITD failed to exhaust its administrative remedies on grant five, we affirm the district court's judgment granting summary judgment in favor of EDA on this final grant.

I

As we have noted, in 1983, Congress appropriated funds to the Economic Development Administration ("EDA") to conduct a feasibility study (the "Study") exploring a proposal by Mississippi to provide federal funding for the establishment of the Mississippi Institute for Technology Development ("ITD"). ITD would develop capabilities for transferring scientific research from Mississippi's universities into useful commercial applications. In 1984, as a result of the Study, Congress appropriated to EDA twenty million dollars to be distributed to ITD through five grant awards over a four-year period.[1] At the end of this time, Congress expected the organization to be self-supporting. Mississippi

---

[1]From the first appropriation of seven million dollars, EDA awarded ITD a grant for two million dollars in January 1985 and a grant for five million dollars in September 1985. In September 1986, from the second appropriation of six million dollars, EDA awarded ITD a grant of six million dollars. In September 1987, from the third appropriation of four million dollars, EDA awarded ITD slightly less than four million dollars, with the remainder paying for the Study. Finally, in 1988, from the fourth appropriation of three million dollars, EDA awarded ITD a grant of three million dollars.

4

appropriated most of the additional funds to support ITD.

Before disbursement of each of the five grants, ITD was required to submit to EDA a "Grant Request" containing a budget proposal for spending the federal funds. EDA would respond with a "Demonstration Grant Offer" to ITD, which reflected the extent of and forms of its approval of the Grant Request. ITD's acceptance of this Offer constituted a "Grant Agreement." Each Grant Agreement incorporated by reference two documents—ITD's Grant Request and a document setting out general "Terms and Conditions" of the agreement. These Terms and Conditions required that the grant "be used only for the research project approved by the [EDA] and inconformity with the approved research budget." Additionally, the Grant Agreements prohibited the use of federal grant funds "to pay for capital assets or other items not treated as expenses under accepted accounting principles." Finally, in determining the allowability of expenses made by ITD, the Grant Agreements provided that both ITD and EDA would adhere to certain Office of Management and Budget Circulars, including Circular A-122.

In 1988, the Office of Inspector General of the Department of Commerce (the "Inspector General") conducted an audit of ITD's first four grants. This draft audit report stated that ITD claimed approximately $4.6 million in unallowable costs in the first four grants and that ITD failed to maintain an accounting system for allocating indirect costs or overhead. In its response to the Inspector General's audit report, ITD contended that a portion of the disallowed costs in fact were allowable. Additionally, Leonard

5

R. Vernamonti, the president and chief executive officer of ITD, met with the Inspector General auditors and argued that ITD should be allowed to substitute depreciation and claim it as an allowable cost for a portion of these unallowable costs. In March 1990, the Inspector General issued its final audit report on the first four grants and reduced the amount of disallowed costs to $1.9 million. The Inspector General failed, however, to address whether depreciation could serve as an allowable substitute cost. In April 1990, ITD submitted a response to the Inspector General's final report, again claiming that depreciation should serve as an allowable substitute cost. EDA issued a final audit determination. EDA stated that depreciation was not an allowable cost under these four grants. EDA further reduced, however, the amount of unallowable costs on these grants to $1,362,142.

On November 8, 1990, ITD appealed EDA's audit determination of the first four grants to L. Joyce Hampers, the Assistant Secretary for Economic Development ("Assistant Secretary"). On August 16, 1991, the Assistant Secretary also denied ITD's request to substitute depreciation for unallowable costs, explaining that "[t]he primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that no one intended that depreciation be charged against the ITD grants"[2]

---

[2]The Assistant Secretary determined the parties' intent only from an examination of the documents in the record. The Assistant Secretary noted that these particular grants prohibited the use of grant funds to pay for the purchase of capital assets. Awarding depreciation costs to ITD, the Assistant Secretary concluded, would effectively require EDA to pay for assets already paid for by Mississippi. This view, however, is

6

because the grants were intended only to provide start-up or seed funding to ITD. The Assistant Secretary recognized that under Circular A-122 depreciation is generally an allowable cost, but stated that her position was based only on the parties' intent, not on the "allowableness issue." She reduced still further, however, the amount due EDA on the first four grants to $1.1 million. ITD submitted additional information to the Assistant Secretary and requested reconsideration, but she maintained her position, stating that depreciation was not intended to be charged to the grants. In somewhat different words from her earlier statement noted above, however, she added that "[t]he primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that there is no provision in the grants for depreciation to be charged as a direct cost."

On August 15, 1991, ITD submitted to EDA a final claim for grant five, which was the last grant disbursed under the appropriations by Congress. ITD included a category for depreciation in this claim but indicated that this cost had been recovered from another funding source. As a result of the Inspector General's audit of this final grant award, EDA disallowed certain costs claimed (depreciation was not claimed) by ITD. ITD ultimately appealed this decision to the Assistant Secretary, but

---

contradicted by the Study, which proposed that federal funds be allocated to pay for "initial office and equipment requirements" for ITD. *See infra* § IV(B)(3), p. ----. Although the grants do prohibit the purchase of these assets from federal funds, Circular A-122 provides that compensation for the use of these assets could be made by depreciation. Circular A-122 att. B § C(9); *see infra* § IV(B)(1), pp. ---- - ----.

failed to request that depreciation be substituted for the disallowed costs. In January 1993, the Assistant Secretary agreed with EDA's audit resolution determination disallowing certain costs claimed by ITD, but, as the issue had not been raised, the Assistant Secretary did not discuss whether depreciation could be substituted for these disallowed costs.

## II

On July 10, 1992, ITD filed a complaint in the United States District Court for the Southern District of Mississippi, under the Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq.*, against EDA, the Secretary of Commerce, and various officials at the Department of Commerce. ITD alleged that the Assistant Secretary erred in refusing to allow depreciation as a substitute cost in the first four grants. After receiving the adverse decision in grant five, ITD filed a supplemental complaint raising allegations identical to those argued in the original complaint. After considering the parties' motion and cross-motion for summary judgment on both the original and supplemental complaint, the district court granted EDA's motion with respect to both complaints and refused to recognize depreciation as an allowable substitute cost. The court concluded that EDA had correctly determined that the grants were not intended to cover depreciation costs because the grants were intended solely to provide start-up funds towards ITD's establishment. As to the final grant, the court found that ITD had waived its right to judicial review by failing to exhaust its administrative remedies by raising the issue of depreciation as

8

a substitute cost before the Assistant Secretary.  The court went on to hold, however, that summary judgment on the merits in favor of EDA was nevertheless appropriate on grant five, under the same rationale as that given for the first four grants.  ITD appeals from this judgment in favor of EDA, dismissing ITD's case.

On appeal, ITD argues that because under the Grant Agreements and applicable regulations depreciation is an allowable substitute cost, the district court erred in affirming the Assistant Secretary's decision.[3]

### III

The sole question presented on appeal is whether in this case, and under the terms of these particular grants, depreciation costs may constitute an allowable substitute for those costs that EDA disallowed.[4]  We start with the premise that the terms of a grant agreement are binding on both the grantee and the grantor.

_____

[3]EDA argues that ITD has waived its right to judicial review of grant five because of its failure to raise the issue of substituting depreciation for disallowed costs to the Assistant Secretary.  In fact, the district court ruled that ITD waived its right to judicial review.  We affirm the district court on this point.  Because ITD failed to raise the issue of depreciation with respect to the final grant before the Assistant Secretary, ITD is foreclosed from raising it here. *Texas v. United States,* 866 F.2d 1546, 1561 (5th Cir.1989).  Consequently, we will limit our review to ITD's first four grants.

[4]The issue is narrowed by delineating what is not at issue on this appeal:  ITD does not complain that the costs that EDA disallowed should have been allowed, but argues only that it should be allowed to substitute depreciation costs in place of these unallowable costs;  EDA does not dispute that ITD has the right to substitute allowable costs for disallowed costs, but only contends that depreciation in this case is not an allowable substitute cost.  Finally, in this case, we decide only that under the terms of the grants depreciation may be an allowable substitute cost.

9

*United States v. Marion County Sch. Dist.,* 625 F.2d 607, 609 (5th Cir.1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981). Although grant agreements have this contractual aspect, the Supreme Court has further explained that, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Dep't. of Educ.,* 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985). Accordingly, to determine whether depreciation was intended by the parties to be an allowable cost under these grants, we must examine the actual, binding Grant Agreements between ITD and EDA, including the incorporated documents—the Terms and Conditions, the Grant Requests, and Circular A-122—the legislative history underlying the grants, and the Study ordered by Congress prior to awarding these funds. This examination leads us to the unmistakable conclusion that Circular A-122's general recognition of depreciation as an allowable indirect cost forms a basic part of the agreement between EDA and ITD, and its terms and provisions are uncontradicted by other record evidence. We will now proceed to demonstrate how we reach our conclusion.

IV

A

Because this is a case on appeal from the district court's grant of summary judgment, we review the record *de novo. Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1412 (5th

10

Cir.1993). Under Rule 56(c) of the Federal Rules of Civil Procedure, we examine evidence presented to determine that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Consequently, we are not required to defer to the district court's factual findings.

"It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). Moreover, we base our review of an administrative action "on the full administrative record that was before the [administrative officer] ... at the time he made his decision." *Milena Ship Management Co. v. Newcomb,* 995 F.2d 620, 624 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994). As a general rule, we uphold an agency's factual findings if they are supported by substantial evidence. *Hawkins v. Agricultural Marketing Serv.,* 10 F.3d 1125, 1128 (5th Cir.1993). Here, however, no testimonial evidence was taken and no issues purely of fact were determined by the agency. In short, we are not reviewing the factual findings of the agency, nor are we reviewing an interpretation of the agency's own regulations with respect to which it has some expertise. Consequently, in this case we owe no deference to the agency's determination. *Pennzoil Co. v. Federal Energy Regulatory Comm'n.,* 789 F.2d 1128, 1135 (5th Cir.1986). Unlike factual findings, we review questions of law freely and are

11

under no obligation to defer to the agency's legal conclusions. *Pennzoil,* 789 F.2d at 1135 (citing *Coca-Cola Co. v. Atchison, Topeka and Santa Fe Ry. Co.,* 608 F.2d 213, 218 (5th Cir.1979). As our analysis involves the interpretation of regulations of a different agency, congressional policy, and contractual agreements—all of which involve issues of law—our review is effectively *de novo. See Snug Harbor, Ltd. v. Zurich Ins.,* 968 F.2d 538, 541 (5th Cir.1992) (finding question of ordinary contract interpretation generally reviewed *de novo* ).

B

There are a few predicate principles that we need to keep in mind as we consider whether depreciation is an allowable cost under the grants before us:

"The total cost of an award is the sum of the allowable direct and allocable indirect costs less any applicable credits," not to exceed the total appropriated funds.[5] Office of Management and Budget, Cost Principles for Nonprofit Organizations, Circular No. A-122 att. A § A(1), (CCH) ¶ 18,810.10 (July 8, 1980) [hereinafter OMB Circular No. A-122]. Thus, costs under grants, such as the one to ITD, are treated as two broad types—direct and indirect. 2 UNITED STATES GENERAL ACCOUNTING OFFICE, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 10-75 (2d ed.1992). A direct cost is one that can be "identified specifically with a particular final cost objective:  i.e., a

---

[5]We interpret this statement to mean that a grantee can charge both allowable direct and allocable indirect costs against the grant until he recovers the total amount of appropriated funds.

12

particular award, project, service, or other direct activity of an organization." OMB Circular No. A-122 att. A § B(1). "Indirect costs are those that have been incurred for common or joint objectives and cannot be readily identified with a particular final cost objective." *Id.* at § C(1). Depreciation is a typical example of an indirect cost that is generally allowable. *Id.* at § C(2). "A grantee may generally substitute other allowable costs for costs which have been disallowed, subject to any applicable cost ceiling. If additional funds become available as the result of a cost disallowance, those funds should be used to pay any "excess' allowable costs which could not be paid previously because of the ceiling." PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, *supra,* at 10-75. Generally, a cost is allowable under a grant if it meets the grant purposes. *Id.* at 10-74. Consequently, a cost that is not for "grant purposes or is contrary to a condition of the grant is not an allowable cost and may not be properly charged against the grant." *Id.*

We now turn to examine the Grant Agreements, along with its incorporated documents, between the parties, the congressional intent in appropriating the funds, and the findings of the Study to determine whether depreciation is an allowable substitute cost under the grants.

(1)

Each Grant Agreement between EDA and ITD set forth the amount of each grant and defined the purpose of the award. ITD was awarded a grant "for the purpose of assisting and enabling [ITD] to

13

conduct a demonstration project involving [ITD] operations and additional staffing, planning, and implementation."  As we have earlier noted, this brief and vaguely stated purpose found in each of the approximately one and one-half page Grant Agreements must be understood in the light of ITD's statement of its purpose:  to stimulate technical and economic development in Mississippi by transferring research from its universities into commercial applications.  The bare Grant Agreements themselves, however, did not explicitly or implicitly denote depreciation as an allowable or disallowable cost.

Each Grant Agreement incorporated by reference two documents—ITD's Grant Request and a document setting out general "Terms and Conditions" of the agreement.  The Grant Request set out a budget, projecting anticipated operational expenses for each of ITD's existing divisions and anticipated start-up expenses for new divisions of ITD.  The Grant Requests made no reference to depreciation.  The Terms and Conditions stated that "[t]he grant can be used only for the research project approved by [EDA] and in conformity with the approved research budget."  The Terms and Conditions also prohibited the use of federal grant funds "to pay for capital assets or other items not treated as expenses under accepted accounting principles."  The Terms and Conditions document, however, does not address the recovery of depreciation expenses.

Most importantly, the Grant Agreements specifically incorporated Office of Management and Budget Circular A-122, which

14

provided that both ITD and EDA were bound to follow the principles of Circular A-122 in determining the allowability of ITD's expenses. To be allowable, Circular A-122 provides that the costs must "[b]e reasonable for the performance of the award and be allocable thereto under these principles" and "conform to any limitations or exclusions set forth ... in the award." OMB Circular No. A-122 att. A § A(1), (2)(a). To determine whether a cost is "reasonable," Circular A-122 directs EDA to consider "[w]hether the cost is of a type generally recognized as ordinary and necessary for the operation of the organization or the performance of the award." *Id.* at § A(3)(a). Circular A-122 explicitly identifies depreciation as a typical example of an allowable indirect cost. *Id.* at § C(2). Finally, Circular A-122 provides that when determining the allowability of a particular cost, "[c]ompensation for the use of buildings, other capital improvements and equipment on hand may be made through use allowances or depreciation." Circular No. A-122 att. B § C(9).

In short, although the Grant Agreements, Grant Requests, and Terms and Conditions do not specifically refer to depreciation as an allowable cost under these grants, Circular A-122 clearly recognizes depreciation as an allowable cost and approves depreciation as a method for compensating for use of an asset.

(2)

We next turn to discuss the congressional intent behind the appropriation of these grant funds. After receiving favorable feedback from the Study that it had commissioned, Congress

15

appropriated money "toward establishment of the Institute." S.REP. No. 570, 98th Cong., 2d Sess. 9 (1984). In its report recommending funding, the Senate Appropriations Committee explained that it expected to provide no more than twenty million dollars over a four-year period for a "demonstration project" that would coordinate several research centers in Mississippi "to contract for research and development work that should lead to technology transfer benefits for State and regional industries." S.REP.No. 570. The Senate explained that ITD should be self-supporting by the end of the four-year period. *Id.* In the next two appropriation bills, Congress approved grants "consistent" with its original appropriation. S.REP. No. 150, 99th Cong., 1st Sess. 7 (1985); S.REP. No. 425, 99th Cong., 2d Sess. 9 (1986). In the following appropriation, Congress expressly stipulated that no grant funds could be used for a specific category of costs—"attorneys' or consultants' fees in connection with securing grants and contracts" from EDA. H.R.J.Res. 395, 100th Cong., 1st Sess., 101 Stat. 1329-2 (1987).

In sum, neither the appropriation laws nor the corresponding legislative histories address specifically whether ITD's grants could be used to cover depreciation.

(3)

As we have noted, before Congress funded this proposal and before EDA and ITD executed the Grant Agreements, Congress approved funds for EDA to conduct the Study, which examined the appropriateness of federal funding. The Study defined ITD's

16

funding requirements as "start-up funds, ongoing support funds, project development funds, outside investment funds, and funds for technology assistance."  The Study proposed that federal funds be allocated to pay for "a portion of the start-up funds over a five-year period," while state money would pay for "start-up funds and ongoing support."  The Study defined "start-up funds" as the money needed "to pay for the services of the key staff who must be recruited for ITD central and the individual centers, *initial office and equipment requirements for both,* and expenses incurred in initial efforts to establish ITD and its center as potential recipients of government and industry R & D grants." (emphasis added).   The Study provided no discussion or recommendation, however, on the payment of depreciation expenses.

V

Having reviewed the relevant evidence and legal principles relating to the issue before us, we now come to our analysis. First we note that the efforts that ITD has made in its attempt to claim all appropriated funds appears to be congruous with and according to the regulations.  When costs are disallowed, as was the case here, and appropriated funds have not been exhausted, the grantee is permitted under the regulations to substitute a cost that it had not claimed for that disallowed cost.  The substitute cost, of course, must be one that is allowable under the regulations.  Thus, because unexhausted funds remain in the ITD appropriations, ITD had a right under the regulations to claim a

17

substitute cost.[6]   Accordingly, it claimed its costs of depreciation.  The only question before us, therefore, is whether depreciation may be such an allowable substitute cost.

Ruling on this question, the Assistant Secretary acknowledged that depreciation is an allowable cost generally under Circular A-122, but she said that her decision denying depreciation was based on the parties' intent.  Furthermore, when the Assistant Secretary ruled on ITD's motion for reconsideration, she said "[t]he primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that there is no provision in the grants for depreciation to be charged as a direct cost."  The only way we can read this cryptic reasoning is as the district court did:  support for her position that the parties did not intend to charge depreciation against the grants because initially it was not claimed as a cost.[7]  The only evidence from which the intent of the parties can be gleaned, however, is from the Grant Agreements, Grant Requests, Terms and Conditions, Circular A-122, from the legislative history underlying the appropriations, and

---

[6]We reiterate that substitute costs on a particular grant are only allowable up to the total amount of that grant.  The Assistant Secretary pointed out in her opinion to response to ITD's motion for reconsideration that costs equal to the entire award for the fourth grant were accepted and thus no substitute costs would be allowed.  This consideration, of course, would be relevant in the district court's determination of the amount ITD will be allowed to claim for depreciation as a substitute cost.

[7]It seems to us that such an observation disregards the very nature of a *substitute* cost.  One would hardly expect to find a provision for a substitute cost in the initial grant papers;  it is only after a cost reflected in the grant papers has been disallowed that a claim for a substitute cost arises.

18

from the Study. Our earlier review of each of these documents determined that there is no evidence that depreciation was not intended to be an allowable substitute cost under these grants.

Yet, Circular A-122 clearly recognizes depreciation as an allowable cost and, as part of the contract between the parties, is binding on EDA and ITD in the absence of a contrary expression. To be sure, Circular A-122 is the only record evidence addressing depreciation. Because Circular A-122 is part of the contract between the parties and because we find no evidence of the parties' intent that would justify disregarding its clear statement, we hold that depreciation may be an allowable substitute cost under these grants.

Accordingly, we REVERSE the judgment of the district court as to the first four grants and REMAND for further proceedings not inconsistent with our opinion. As to grant five, we AFFIRM the district court because ITD waived its right to judicial review by failing to raise the issue of depreciation before the Assistant Secretary. For the foregoing reasons, the judgment of the district court is

AFFIRMED in part and REVERSED and REMANDED in part.[8]

---

[8]It is rather clear that the majority and the dissent have a fundamentally different concept of the issue presented in this case. The majority views the question as whether depreciation is an allowable *substitute* cost under these grants. The dissent, however, concludes that because ITD failed to claim depreciation originally in its Grant Requests, ITD cannot now claim depreciation as an allowable cost, substitute or otherwise.

The majority opinion does not stand for the proposition that any and all depreciation costs submitted by ITD are automatically allowable substitute costs. We hold only that

19

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I agree with my learned colleagues that the district court did not err in dismissing the claim of the Institute for Technology Development ("ITD") under Grant V and concur in their affirmance of that dismissal. As to the remainder of my colleagues' holding, I respectfully dissent. A statement of the reasons for my dissent requires some reiteration of, and elaboration on, the facts contained in the majority opinion.

When, in 1983, the ITD asked Congress to furnish a portion of ITD's "start-up funds", the Economic Development Administration ("EDA") entered into an agreement with Arthur D. Little, Inc. to conduct a study of the feasibility of the proposed institution. Following a recommendation that federal participation in the program was warranted "on a demonstration basis," Congress appropriated $7 million for EDA to use in this manner.

Thereafter, ITD submitted a 38-page "Task Force Report Blueprint for Action Initial Corporate Strategy" and a funding request for $2 million. The report contained a projected first year budget entitled "Initial Budget Authorization/Projected First-

---

depreciation may be an allowable substitute cost under these grants and that the parties did not intend otherwise. Whether individual claims of depreciation are allowable substitute costs is another question. On remand, the burden will plainly rest on ITD to prove that it is entitled to each claim of depreciation it asserts. It is thus clear that the district court will be free to examine to what extent depreciation may be allowed as a substitute cost on the various claims of ITD. In this connection, the district court, of course, may fully consider whether adequate records support ITD's claimed depreciation costs.

20

Year Proposals."  No item for depreciation was contained in this budget or anywhere else in the Task Force Report, and nowhere was there any mention of "indirect costs", which arguably might have been said to include depreciation.

In response to this request, the EDA made a $2 million "DEMONSTRATION GRANT OFFER", which reads in pertinent part as follows:

> The Economic Development Administration, in accordance with the objectives of section 301(f) of the Public Works and Economic Development Act of 1965, as amended, (hereinafter called "the Act") hereby offers to

> The Institute for Technology Development Jackson, Mississippi

> (hereinafter called "the Grantee") grant assistance, subject to the terms, conditions, and limitations as set forth herein and in the attached General Terms and Conditions.  This award is for the purpose of assisting and enabling the Grantee to conduct a demonstration project to perform initial Institute staffing, planning, and implementation, which project is deemed useful and pertinent to the long range accomplishment of the objectives of the Act.

> The Grantee's proposal, "Task Force Report Blueprint for Action:  Initial Corporate Strategy," of October 2, 1984 is hereby incorporated as part of this Grant Offer.  To the extent that the proposal conflicts with this Grant Offer and/or applicable sections of the General Terms and Conditions of the demonstration grant, the Grant Offer and the General Terms and Conditions shall prevail.

I quote this pertinent portion in full because it is typical of the conditions and restrictions in each of the Grants that followed.  In each of the Grants, the terms of ITD's proposal are incorporated in the Grant Offer except when the proposal's terms conflict with the Grant Offer or the applicable General Terms and Conditions, in which case the Grant Offer and General Terms and Conditions control the relations between the parties.

21

The following clauses in the General Terms and Conditions are therefore of controlling importance in each of the several Grants that were made:

> The grant or cooperative agreement assistance hereby made available can be used only for the research project approved by the Economic Development Administration (EDA) and in conformity with the approved research budget.

> .    .    .    .    .    .

> The Awardee shall keep such records as will fully disclose the amount and disposition of the total budgeted funds, the purpose or undertaking for which such funds were used....

On August 2, 1985, ITD submitted a Grant request for "$5M of federal "seed funds.' "  This contained proposed budgets for the several ITD divisions, and nowhere was any mention made of depreciation or indirect costs.  On September 30, 1985, the parties executed a second "DEMONSTRATION GRANT OFFER."  The "maximum amount" was $5 million, which was to be available for a period of one year.  Once again, the relationship between the terms of the proposal, the Grant Offer and the General Terms and Conditions—i.e., the controlling effect of the Grant Offer and General Terms and Conditions—was stated specifically.

On February 10, 1987, ITD, as it was required to do, submitted a fund expenditure report covering the two above-described Grant Offers.  The report mentions neither depreciation nor indirect costs.  For purposes of illustration only, I attach as an exhibit a portion of the report covering the disposition of the $2 million Grant.  *See* Appendix.

On August 21, 1986, ITD requested an additional Grant of over $6 million, and on September 30, 1986, a "DEMONSTRATION GRANT

22

OFFER" in the amount of $6 million was executed by the parties. A fourth "DEMONSTRATION GRANT OFFER" in the sum of $3,900,273 was executed on September 30, 1987. Both the 1986 and 1987 awards incorporated the above-quoted provisions making the terms of the Grant Offer and General Terms and Conditions paramount.

It is clear and undisputed that none of the Grant proposals or agreements mentioned or included depreciation as a reimbursable expense. Moreover, evidence in the record demonstrates clearly that the parties did not intend that depreciation be included as such. EDA's position was stated by L. Joyce Hampers, Assistant Secretary for Economic Development, as follows:

> The primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that no one intended that depreciation be charged against the ITD grants.

ITD's failure to request in its Grant proposals that it be reimbursed for depreciation or indirect costs and its failure to treat any of the funds it received as such reimbursement, demonstrate that Ms. Hampers correctly stated its intent. The General Terms and Conditions provide that "[t]he Awardee shall keep such records as will fully disclose the amount and disposition of the total budgeted funds [and] the purpose or undertaking for which such funds were used." Moreover, both Office of Management and Budget ("OMB") Circular No. A-110 and the General Terms and Conditions, which were made a part of each award, provide for Periodical Progress and Budget Reports. These reports required the disclosure of each budgeted item and the amount spent on each. Finally, OMB uses a form entitled "Financial Status Report" which

23

contains a separate bracket for "Indirect Expense", in which the grantee is directed by OMB to "enter total amount of indirect costs charged during the report." None of ITD's reports contained a claim for depreciation as a budgeted item, an expenditure, or an "Indirect Expense." Indeed, ITD did not even maintain a cost accounting system which would provide for the allocation of indirect costs such as depreciation. It was not until October 1989, after the Office of Inspector General had completed its draft audit report finding improper charges of millions of dollars in unallowable costs, that ITD first suggested the possibility of substituting depreciation for the costs found unallowable in the audit.

All of the above facts are undisputed. Indeed, it was on that basis that both sides moved for summary judgment in the district court. In parting company from my colleagues, I am disturbed at the outset by their disregard or actual rejection of these undisputed facts, a practice which we are not permitted to adopt. My colleagues say, for example, that they "find no evidence of the parties' intent", *supra,* at ----, and that "[t]he Assistant Secretary determined the parties' intent only from an examination of the documents in the record." *Supra,* at ---- n. 2. If we are guided to our conclusion by a review of the facts indicative of intent, I suggest that the above-described undisputed evidence of the conduct of the parties, particularly the conduct of ITD itself, establishes overwhelmingly that ITD did not ask for or expect to receive payment for depreciation. In all of the exchanges between

24

the parties over a period of four years, the word "depreciation" is not mentioned once.  However, while I am convinced that my colleagues mishandled established facts, my problem with the majority opinion is more broad-reaching in its scope than the majority's *de novo* review of evidence submitted to an administrative body.

In *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980), which involved the Federal Reserve Board's interpretation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.,* Justice Brennan, writing for the Court, wisely stated that "a court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views."  This, in brief, states an admonition that has guided our country's highest court for many years.  *See, e.g.:*

> *Environmental Protection Agency v. National Crushed Stone Ass'n,* 449 U.S. 64, 83 [101 S.Ct. 295, 307, 66 L.Ed.2d 268] (1980):
>
>> It is by now a commonplace that "when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16 [85 S.Ct. 792, 801, 13 L.Ed.2d 616] (1965).  [footnote omitted];
>
> *Blanding v. DuBose,* 454 U.S. 393, 401 [102 S.Ct. 715, 719, 70 L.Ed.2d 576] (1982) (per curiam):
>
>> Finally, we have frequently stated that courts should grant deference to the interpretation given statutes and regulations by the officials charged with their administration.  [citations omitted];
>
> *Howe v. Smith,* 452 U.S. 473, 485 [101 S.Ct. 2468, 2476, 69 L.Ed.2d 171] (1981):

Because the Attorney General, and through him the Bureau of Prisons, are charged with the administration of § 5003, their view of the meaning of the statute is entitled to considerable deference. [citations omitted];

*Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.... When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.

Adherence to the practice described in the above cases is particularly important where there is an ambiguity in the statute or regulation at issue. *See:*

*Stinson v. United States,* [--- U.S. ----, ----] 113 S.Ct. 1913, 1918 [123 L.Ed.2d 598] (1993):

Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984), if a statute is unambiguous the statute governs; if, however, Congress' silence or ambiguity has "left a gap for the agency to fill," courts must defer to the agency's interpretation so long as it is "a permissible construction of the statute." *Id.* at 842-843 [104 S.Ct. 2781-82];

*Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39 [102 S.Ct. 38, 46, 70 L.Ed.2d 23] (1981):

Hence, in determining whether the Commission's action was "contrary to law," the task for the Court of Appeals was not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commission's construction was "sufficiently reasonable" to be accepted by a reviewing court. *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75 [95 S.Ct. 1470, 1479, 43 L.Ed.2d 731] (1975); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450 [98 S.Ct. 2441, 2445, 57 L.Ed.2d 337] (1978). To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. *Ibid.; Udall v. Tallman,* 380 U.S., at 16 [85 S.Ct. at 801];

26

> *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136] (1946).*;*

> *Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 153-54 [67 S.Ct. 245, 250, 91 L.Ed. 136] (1946):

>> The "reviewing court's function is limited." All that is needed to support the Commission's interpretation is that it has "warrant in the record" and a "reasonable basis in law." *Labor Board v. Hearst Publications, Inc.,* [322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944) ]; *Rochester Telephone Corp. v. United States,* 307 U.S. 125 [59 S.Ct. 754, 83 L.Ed. 1147] (1939).

Although this Court has not been the most enthusiastic adherent to the above-stated principles, it would be a mistake to say that we disregard them. The Supreme Court's seminal decision in *Udall v. Tallman, supra,* has been cited by this Court on a host of occasions. *See* Vol. 1.6 *Shepard's United States Citations* at 497 (7th ed. 1994). Thus, in *First Gibraltar Bank, FSB v. Morales,* 19 F.3d 1032, 1036 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994), *opinion vacated and superseded on other grounds,* 42 F.3d 895 (5th Cir.1995), we said:

>> We are required to give deference to an executive agency's interpretation of a statute or regulation that the agency is responsible for administering. Of course, if the intent of Congress is clear, that intent will trump any agency interpretation to the contrary. If Congress did not directly address the precise question at issue, however, we must defer to the agency's interpretation of that statute as expressed in its regulations unless those regulations are arbitrary, capricious, or manifestly contrary to the statute. Deference is even more clearly in order when an agency construction of its own regulations is involved; the agency construction is controlling unless it is plainly erroneous or inconsistent with the regulation. [citations omitted]

*See also:*

> *Hawkins v. Agricultural Mktg. Serv.,* 10 F.3d 1125, 1129 (5th Cir.1993):

>> Legal issues, however, are " "for the courts to

resolve, although even in considering such issues the courts are to give some deference to the [agency's] informed judgment.' " *Faour* [*v. United States Dep't of Agric.,* 985 F.2d 217, 219 (5th Cir.1993) ] (quoting *Federal Trade Comm'n* [*v. Indiana Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986) ] ).;

*Texas Mun. Power Agency v. Administrator of the United States Envtl. Protection Agency,* 836 F.2d 1482, 1488 (5th Cir.1988):

We are required to defer to any reasonable EPA construction of its enabling statutes. When resolving an apparent conflict among EPA regulations, even greater deference is in order. As the Supreme Court stated in *Udall v. Tallman:*

When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.... "[T]he ultimate criterion is the administrative interpretation, which becomes controlling weight unless it is plainly erroneous or inconsistent with the regulation." [footnote citations omitted];

*Coca-Cola Co. v. Atchison, Topeka, and Santa Fe Ry. Co.* 608 F.2d 213, 222 (5th Cir.1979):

Nevertheless, even where the issue is one of pure law, such as interpretation of contracts, tariffs, regulations and statutes, room still is present for deference to the views of administrative agencies, particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry. [citations omitted]

*United States v. Articles of Drug,* 625 F.2d 665, 675 (5th Cir.1980):

Of course, when there is more than one reasonable interpretation, the court is bound to follow that of the agency. [footnote citations omitted]

In contrast to all of the above-cited authority, my colleagues state that "[a]s [their] analysis involves the interpretation of regulations, congressional policy, and contractual agreements—all of which involve issues of law—[their] review is *de novo* " and that they "owe no deference to the agency's determination." *Supra,* at

28

----.    In support of this holding, they cite *Pennzoil Co. v. Federal Energy Regulatory Comm'n,* 789 F.2d 1128 (5th Cir.1986) and *Snug Harbor, Ltd. v. Zurich Ins.,* 968 F.2d 538 (5th Cir.1992), neither of which stands for the proposition they endorse. *Pennzoil* involved an agency interpretation of a contract between two private parties, and *Snug Harbor* did not involve an agency at all.  This case, by contrast, involves an agency's action with respect to a grant program that it was charged by Congress to administer, and that agency's interpretation of grant terms and regulations with which it was thoroughly familiar.

In short, although I do not contend that the EDA's interpretation of its Grants is binding on this Court, I believe that when my colleagues undertook to conduct a completely *de novo* interpretation of these documents, they erred.  I might be willing to overlook this error if my colleagues were correct in their "unmistakable conclusion that Circular A-122's general recognition of depreciation as an allowable indirect cost forms a basic part of the agreement between EDA and ITD."  *Supra,* at ----.  However, this "unmistakable conclusion" is wrong.

The principles enunciated in Circular A-122 are directed to be used "by all Federal agencies in determining the costs of work performed by nonprofit organizations under grants, cooperative agreements, costs reimbursement contracts, and other contracts in which costs are used in pricing, administration, or settlement." OMB could not have intended to mandate that depreciation be treated as an allowable cost in every one of the varied situations in which

29

costs might be used in pricing, in administration, or in settlement. Circular A-122 takes this diversity into account when it provides that "[b]ecause of the diverse characteristics and accounting practices of nonprofit organizations, it is not possible to specify the types of cost which may be classified as indirect cost in all situation[s]." The Circular then elaborates:

> However, typical examples of indirect cost for many nonprofit organizations may include depreciation or use allowances on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

A fair reading of this clause is that the word "may" in reference to the conduct of "many nonprofit organizations" is used in its ordinary sense as a word of authorization, not of command. *See Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond, Virginia,* 262 U.S. 649, 662-63, 43 S.Ct. 651, 656, 67 L.Ed. 1157 (1923); *United States v. Lexington Mill & Elevator Co.,* 232 U.S. 399, 411, 34 S.Ct. 337, 340-41, 58 L.Ed. 658 (1914). As one treatise explains:

> OMB Circulars do not determine whether [indirect] costs are reimbursable by the federal government. OMB has systems for calculating the amount of indirect costs *if* they are reimbursable. An essential prerequisite to the use of OMB's systems is the provision in grant agreements for the payment of indirect costs....

1 Richard B. Cappalli, *Federal Grants & Cooperative Agreements* § 4.53, at 282 (1991 Cum.Supp.) (emphasis in original).

Circular A-122 specifically provides that for costs to be allowable under an award they must be "reasonable for the performance of the award," must "[c]onform to any limitations or

30

exclusions ... in the award as to types or amount of cost items," and must be "adequately documented." Each of the four Grants at issue herein specifically provides that the "Grant Offer and the General Terms and Conditions shall prevail," and the General Terms and Conditions that accompany each Grant Offer provide that "[t]he grant or cooperative agreement assistance hereby made available can be used only for the research project approved by the Economic Development Administration (EDA) and *in conformity with the approved research budget.*" (emphasis supplied) As discussed above, none of the budgets submitted by ITD, let alone any approved by the EDA, provides for the reimbursement of indirect costs or depreciation.

If there is any ambiguity in the foregoing provisions, and I submit there is none, the ambiguity was resolved by EDA's administrative rulings, to which this Court should give consideration.

In 1989 and 1990, the Office of Inspector General of the United States Department of Commerce conducted two audits of ITD. The following brief excerpts from the final audit report furnish an enlightening backdrop for our review:

> Our audit revealed significant, serious deficiencies in ITD's financial management system and procurement practices, which resulted in substantial waste and abuse of funds provided by the federal government and the $3.7 million of improper claims. Moreover, it is quite clear that responsible officers and employees of ITD were fully aware that ITD's accounting methods and fiscal practices did not conform to federal financial standards, but made no effort to remedy the situation until we commenced our audit. Indeed, Institute officials simply chose to ignore certain federal requirements, such as Office of Management and Budget (OMB) circulars.

31

.  .  .  .  .

During the course of our audit, it also became readily apparent that ITD's procurement practices violated federal standards, resulting in the improper and wasteful use of more than a million dollars in federal funds.

Specifically, since 1985 ITD has purchased [$]1.1 million worth of goods and services through unjustified sole source contracts, in complete and purposeful disregard of federal requirements that mandate the maximum practicable competition in connection with procurements. The Institute consistently failed to execute adequate written contracts or agreements, which resulted in a serious lack of control over contractor performance and costs. ITD has also engaged in procurement practices which created, at the very least, the appearance of conflicts of interest and has countenanced employee activities in apparent violation of procurement conduct codes....

ITD officials agree that by not having an overhead cost allocation system they were not complying with the federal standards in OMB Circular A-110....

Findings such as the foregoing encourage me in my belief that we should not reward the misconduct above described by a benevolent interpretation of the facts and the law at issue herein. In sum, regardless of whether we give some consideration to the EDA's holdings, as I believe we should, or whether we embark on a completely *de novo* review, I believe that the judgment of the district court should be affirmed. I so vote.[1]

---

[1]At the risk of initiating a ping-pong exchange of footnotes, I feel compelled to respond to footnote 8 of the majority opinion, particularly the portion thereof that erroneously describes the basis for my dissent, *viz.,* "because ITD failed to claim depreciation in its Grant requests" it cannot claim it now. I do in fact state that the undisputed evidence of ITD's conduct "establishes overwhelmingly that ITD did not ask for or expect to receive payment for depreciation," *supra,* at ----. However, that statement is primarily in response to my colleagues' statement that they could find no evidence of the parties' intent. *See Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676, 679 (5th Cir.1989). It is not the be-all and end-all of the dissenting opinion. A more accurate statement of the dissent's position is that it is predicated upon the

INSTITUTE FOR TECHNOLOGY DEVELOPMENT

ANALYSIS OF EXPENDITURES FOR

$2 MILLION DEMONSTRATION FEDERAL GRANT

| DESCRIPTION | AMOUNT |
|---|---|
| Salaries & Allowances | $ 429,347.40 |
| Consulting | 552,976.42 |
| Contractual | 217,483.95 |
| Insurance | 44,917.92 |
| Taxes | 32,004.11 |
| Retirement | 26,409.00 |
| Relocation Costs | 40,495.88 |
| Professional Development | 5,321.28 |
| Printing & Duplication | 20,201.02 |
| Postage & Express Mail | 7,067.10 |
| Telephone | 27,399.99 |
| Utilities | 21.44 |
| Rent | 8,727.47 |
| Equipment Rental | 6,797.39 |
| Repairs & Maintenance | 11,298.94 |
| Legal & Accounting | 58,175.33 |
| Other Professional Fees | 133,725.33 |
| Trustee Fees | 2,713.50 |
| Dues & Subscriptions | 7,128.32 |
| Supplies | 93,973.64 |
| Travel | 273,814.57 |

---

unchallengeable fact that Grant assistance was available to ITD only if it conformed to an "approved research budget," and none of the budgets incorporated in the Grant agreements at issue herein contained any reference whatsoever to depreciation. In other words, the claims now being made for depreciation were not "otherwise allowable" under the Grant agreements, as required by Comptroller General Report B-208871.2, entitled "Substitution."

Total                                          $2,000,000.00

_____

_____