VAN GRAAFEILAND, Circuit Judge,
concurring in part and dissenting in part:
I agree with my learned colleagues that the district court did not err in dismissing the claim of the Institute for Technology Development (“ITD”) under Grant V and concur in their affirmance of that dismissal. As to the remainder of my colleagues’ holding, I respectfully dissent. A statement of the reasons for my dissent requires some reiteration of, and elaboration on, the facts contained in the majority opinion.
When, in 1983, the ITD asked Congress to furnish a portion of ITD’s “start-up funds”, the Economic Development Administration (“EDA”) entered into an agreement with Arthur D. Little, Inc. to conduct a study of the feasibility of the proposed institution. Following a recommendation that federal participation in the program was warranted “on a demonstration basis,” Congress appropriated $7 million for EDA to use in this manner.
Thereafter, ITD submitted a 38-page “Task Force Report Blueprint for Action Initial Corporate Strategy” and a funding request for $2 million. The report contained a projected first year budget entitled “Initial Budget Authorization/Projected First-Year Proposals.” No item for depreciation was contained in this budget or anywhere else in the Task Force Report, and nowhere was there any mention of “indirect costs”, which arguably might have been said to include depreciation.
In response to this request, the EDA made a $2 million “DEMONSTRATION GRANT OFFER”, which reads in pertinent part as follows:
The Economic Development Administration, in accordance with the objectives of section 301(f) of the Public Works and Economic Development Act of 1965, as amended, (hereinafter called “the Act”) hereby offers to
The Institute for Technology Development Jackson, Mississippi
(hereinafter called “the Grantee”) grant assistance, subject to the terms, conditions, and limitations as set forth herein and in the attached General Terms and Conditions. This award is for the purpose of assisting and enabling the Grantee to conduct a demonstration project to perform initial Institute staffing, planning, and implementation, which project is deemed useful and pertinent to the long range accomplishment of the objectives of the Act.
The Grantee’s proposal, “Task Force Report Blueprint for Action: Initial Corporate Strategy,” of October 2, 1984 is hereby incorporated as part of this Grant Offer. To the extent that the proposal conflicts with this Grant Offer and/or applicable sections of the General Terms and Conditions of the demonstration grant, the Grant Offer and the General Terms and Conditions shall prevail.
I quote this pertinent portion in full because it is typical of the conditions and re *454 strictions in each of the Grants that followed. In each of the Grants, the terms of ITD’s proposal are incorporated in the Grant Offer except when the proposal’s terms conflict with the Grant Offer or the applicable General Terms and Conditions, in which case the Grant Offer and General Terms and Conditions control the relations between the parties.
The following clauses in the General Terms and Conditions are therefore of controlling importance in each of the several Grants that were made:
The grant or cooperative agreement assistance hereby made available can be used only for the research project approved by the Economic Development Administration (EDA) and in conformity with the approved research budget.
The Awardee shall keep such records as will fully disclose the amount and disposition of the total budgeted funds, the purpose or undertaking for which such funds were used....
On August 2,1985, ITD submitted a Grant request for “$5M of federal ‘seed funds.’ ” This contained proposed budgets for the several ITD divisions, and nowhere was any mention made of depreciation or indirect costs. On September 30, 1985, the parties executed a second “DEMONSTRATION GRANT OFFER.” The “maximum amount” was $5 million, which was to be available for a period of one year. Once again, the relationship between the terms of the proposal, the Grant Offer and the General Terms and Conditions — i.e., the controlling effect of the Grant Offer and General Terms and Conditions — was stated specifically.
On February 10, 1987, ITD, as it was required to do, submitted a fund expenditure report covering the two above-described Grant Offers. The report mentions neither depreciation nor indirect costs. For purposes of illustration only, I attach as an exhibit a portion of the report covering the disposition of the $2 million Grant. See Appendix.
On August 21, 1986, ITD requested an additional Grant of over $6 million, and on September 30, 1986, a “DEMONSTRATION GRANT OFFER” in the amount of $6 million was executed by the parties. A fourth “DEMONSTRATION GRANT OFFER” in the sum of $3,900,273 was executed on September 30, 1987. Both the 1986 and 1987 awards incorporated the above-quoted provisions making the terms of the Grant Offer and General Terms and Conditions paramount.
It is clear and undisputed that none of the Grant proposals or agreements mentioned or included depreciation as a reimbursable expense. Moreover, evidence in the record demonstrates clearly that the parties did not intend that depreciation be included as such. EDA’s position was stated by L. Joyce Hampers, Assistant Secretary for Economic Development, as follows:
The primary and determinative factor in our decision not to accept depreciation as an allowable substitute cost is that no one intended that depreciation be charged against the ITD grants.
ITD’s failure to request in its Grant proposals that it be reimbursed for depreciation or indirect costs and its failure to treat any of the funds it received as such reimbursement, demonstrate that Ms. Hampers correctly stated its intent. The General Terms and Conditions provide that “[t]he Awardee shall keep such records as will fully disclose the amount and disposition of the total budgeted funds [and] the purpose or undertaking for which such funds were used.” Moreover, both Office of Management and Budget (“OMB”) Circular No. A-110 and the General Terms and Conditions, which were made a part of each award, provide for Periodical Progress and Budget Reports. These reports required the disclosure of each budgeted item and the amount spent on each. Finally, OMB uses a form entitled “Financial Status Report” which contains a separate bracket for “Indirect Expense”, in which the grantee is directed by OMB to “enter total amount of indirect costs charged during the report.” None of ITD’s reports contained a claim for depreciation as a budgeted item, an expenditure, or an “Indirect Expense.” Indeed, ITD did not even maintain a cost accounting system which would provide for the *455 allocation of indirect costs such as depreciation. It was not until October 1989, after the Office of Inspector General had completed its draft audit report finding improper charges of millions of dollars in unallowable costs, that ITD first suggested the possibility of substituting depreciation for the costs found unallowable in the audit.
All of the above facts are undisputed. Indeed, it was on that basis that both sides moved for summary judgment in the district court. In parting company from my colleagues, I am disturbed at the outset by their disregard or actual rejection of these undisputed facts, a practice which we are not permitted to adopt. My colleagues say, for example, that they “find no evidence of the parties’ intent”, supra, at 452, and that “[t]he Assistant Secretary determined the parties’ intent only from an examination of the documents in the record.” Supra, at 448 n. 2. If we are guided to our conclusion by a review of the facts indicative of intent, I suggest that the above-described undisputed evidence of the conduct of the parties, particularly the conduct of ITD itself, establishes overwhelmingly that ITD did not ask for or expect to receive payment for depreciation. In all of the exchanges between the parties over a period of four years, the word “depreciation” is not mentioned once. However, while I am convinced that my colleagues mishandled established facts, my problem with the majority opinion is more broad-reaching in its scope than the majority’s de novo review of evidence submitted to an administrative body.
In Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980), which involved the Federal Reserve Board’s interpretation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., Justice Brennan, writing for the Court, wisely stated that “a court that tries to chart a true course to the Act’s purpose embarks upon a voyage without a compass when it disregards the agency’s views.” This, in brief, states an admonition that has guided our country’s highest court for many years. See, e.cj.:
Environmental Protection Agency v. National Crushed Stone Ass’n, 449 U.S. 64, 83 [101 S.Ct. 295, 307, 66 L.Ed.2d 268] (1980):
It is by now a commonplace that “when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.” Udall v. Tallman, 380 U.S. 1,16 [85 S.Ct. 792, 801, 13 L.Ed.2d 616] (1965). [footnote omitted];
Blanding v. DuBose, 454 U.S. 393, 401 [102 S.Ct. 715, 719, 70 L.Ed.2d 576] (1982) (per curiam):
Finally, we have frequently stated that courts should grant deference to the interpretation given statutes and regulations by the officials charged with their administration, [citations omitted];
Howe v. Smith, 452 U.S. 473, 485 [101 S.Ct. 2468, 2476, 69 L.Ed.2d 171] (1981):
Because the Attorney General, and through him the Bureau of Prisons, are charged with the administration of § 5003, their view of the meaning of the statute is entitled to considerable deference. [citations omitted];
Udall v. Tollman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):
When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.... When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.
Adherence to the practice described in the above cases is particularly important where there is an ambiguity in the statute or regulation at issue. See:
Stinson v. United States, [— U.S.-, -] 113 S.Ct. 1913, 1918 [123 L.Ed.2d 598] (1993):
Under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984), if a statute is unambiguous the statute governs; if, however, Congress’ silence or ambiguity has “left a gap for the agency to fill,” courts must defer to the agency’s interpretation so long as it *456 is “a permissible construction of the statute.” Id. at 842-843 [104 S.Ct. at 2781-82];
Federal Election Comm’n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39 [102 S.Ct. 38, 46, 70 L.Ed.2d 28] (1981):
Hence, in determining whether the Commission’s action was “contrary to law,” the task for the Court of Appeals was not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commission’s construction was “sufficiently reasonable” to be accepted by a reviewing court. Train v. Natural Resources Defense Council, 421 U.S. 60, 75 [95 S.Ct. 1470, 1479, 43 L.Ed.2d 731] (1975); Zenith Radio Corp. v. United States, 437 U.S. 443, 450 [98 S.Ct. 2441, 2445, 57 L.Ed.2d 337] (1978). To satisfy this standard it is not necessary for a court to find that the agency’s construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. Ibid.; Udall v. Tollman, 380 U.S., at 16 [85 S.Ct. at 801]; Unemployment Compensation Comm’n v. Aragon, 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136] (1946).;
Unemployment Compensation Comm’n of Alaska v. Aragon, 329 U.S. 143, 153-54 [67 S.Ct. 245, 250, 91 L.Ed. 136] (1946):
The “reviewing court’s function is limited.” All that is needed to support the Commission’s interpretation is that it has “warrant in the record” and a “reasonable basis in law.” Labor Board v. Hearst Publications, Inc., [322 U.S. 111, 131, 64 S.Ct. 851, 860-61, 88 L.Ed. 1170 (1944)]; Rochester Telephone Corp. v. United States, 307 U.S. 125 [59 S.Ct. 754, 83 L.Ed. 1147] (1939).
Although this Court has not been the most enthusiastic adherent to the above-stated principles, it would be a mistake to say that we disregard them. The Supreme Court’s seminal decision in Udall v. Tollman, supra, has been cited by this Court on a host of occasions. See Vol. 1.6 Shepard’s United States Citations at 497 (7th ed. 1994). Thus, in First Gibraltar Bank, FSB v. Morales, 19 F.3d 1032, 1036 (5th Cir.), cert. denied, — U.S. —, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994), opinion vacated and superseded on other grounds, 42 F.3d 895 (5th Cir.1995), we said:
We are required to give deference to an executive agency’s interpretation of a statute or regulation that the agency is responsible for administering. Of course, if the intent of Congress is clear, that intent will trump any agency interpretation to the contrary. If Congress did not directly address the precise question at issue, however, we must defer to the agency’s interpretation of that statute as expressed in its regulations unless those regulations are arbitrary, capricious, or manifestly contrary to the statute. Deference is even more clearly in order when an agency construction of its own regulations is involved; the agency construction is controlling unless it is plainly erroneous or inconsistent with the regulation, [citations omitted]

See also:

Hawkins v. Agricultural Mktg. Serv., 10 F.3d 1125, 1129 (5th Cir.1993):
Legal issues, however, are “ ‘for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agency’s] informed judgment.’ ” Faour [v. United States Dep’t of Agric., 985 F.2d 217, 219 (5th Cir.1993)] (quoting Federal Trade Comm’n [v. Indiana Fed’n of Dentists, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986) ]).;
Texas Mun. Power Agency v. Administrator of the United States Envtl. Protection Agency, 836 F.2d 1482, 1488 (5th Cir.1988):
We are required to defer to any reasonable EPA construction of its enabling statutes. When resolving an apparent conflict among EPA regulations, even greater deference is in order. As the Supreme Court stated in Udall v. Toll-man:
When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.... “[T]he ultimate criterion is the administrative interpretation, which becomes controlling *457 weight unless it is plainly erroneous or inconsistent with the regulation.” [footnote citations omitted];
Coco-Cola Co. v. Atchison, Topeka, and Santa Fe Ry. Co. 608 F.2d 213, 222 (5th Cir.1979):
Nevertheless, even where the issue is one of pure law, such as interpretation of contracts, tariffs, regulations and statutes, room still is present for deference to the views of administrative agencies, particularly where the understanding of the problem is enhanced by the agency’s expert understanding of the industry, [citations omitted]
United States v. Articles of Drug, 625 F.2d 665, 675 (5th Cir.1980):
Of course, when there is more than one reasonable interpretation, the court is bound to follow that of the agency, [footnote citations omitted]
In contrast to all of the above-cited authority, my colleagues state that “[a]s [their] analysis involves the interpretation of regulations, congressional policy, and contractual agreements — all of which involve issues of law — [their] review is de novo ” and that they “owe no deference to the agency’s determination.” Supra, at 450. In support of this holding, they cite Pennzoil Co. v. Federal Energy Regulatory Comm’n, 789 F.2d 1128 (5th Cir.1986) and Snug Harbor, Ltd. v. Zurich Ins., 968 F.2d 538 (5th Cir.1992), neither of which stands for the proposition they endorse. Pennzoil involved an agency interpretation of a contract between two private parties, and Snug Harbor did not involve an agency at all. This case, by contrast, involves an agency’s action with respect to a grant program that it was charged by Congress to administer, and that agency’s interpretation of grant terms and regulations with which it was thoroughly familiar.
In short, although I do not contend that the EDA’s interpretation of its Grants is binding on this Court, I believe that when my colleagues undertook to conduct a completely de novo interpretation of these documents, they erred. I might be willing to overlook this error if my colleagues were correct in their “unmistakable conclusion that Circular A-122’s general recognition of depreciation as an allowable indirect cost forms a basic part of the agreement between EDA and ITD.” Supra, at 449. However, this “unmistakable conclusion” is wrong.
The principles enunciated in Circular A-122 are directed to be used “by all Federal agencies in determining the costs of work performed by nonprofit organizations under grants, cooperative agreements, costs reimbursement contracts, and other contracts in which costs are used in pricing, administration, or settlement.” OMB could not have intended to mandate that depreciation be treated as an allowable cost in every one of the varied situations in which costs might be used in pricing, in administration, or in settlement. Circular A-122 takes this diversity into account when it provides that “[b]ecause of the diverse characteristics and accounting practices of nonprofit organizations, it is not possible to specify the types of cost which may be classified as indirect cost in all situation[s].” The Circular then elaborates:
However, typical examples of indirect cost for many nonprofit organizations may include depreciation or use allowances on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.
A fair reading of this clause is that the word “may” in reference to the conduct of “many nonprofit organizations” is used in its ordinary sense as a word of authorization, not of command. See Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond, Virginia, 262 U.S. 649, 662-63, 43 S.Ct. 651, 656, 67 L.Ed. 1157 (1923); United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 411, 34 S.Ct. 337, 340-41, 58 L.Ed. 658 (1914). As one treatise explains:
OMB Circulars do not determine whether [indirect] costs are reimbursable by the federal government. OMB has systems for calculating the amount of indirect costs if they are reimbursable. An essential prerequisite to the use of OMB’s systems is the provision in grant agreements for the payment of indirect costs....
*458 1 Richard B. Cappalli, Federal Grants & Cooperative Agreements § 4.53, at 282 (1991 Cum.Supp.) (emphasis in original).
Circular A-122 specifically provides that for costs to be allowable under an award they must be “reasonable for the performance of the award,” must “[c]onform to any limitations or exclusions ... in the award as to types or amount of cost items,” and must be “adequately documented.” Each of the four Grants at issue herein specifically provides that the “Grant Offer and the General Terms and Conditions shall prevail,” and the General Terms and Conditions that accompany each Grant Offer provide that “[t]he grant or cooperative agreement assistance hereby made available can be used only for the research project approved by the Economic Development Administration (EDA) and in conformity with the approved research budget.” (emphasis supplied) As discussed above, none of the budgets submitted by ITD, let alone any approved by the EDA, provides for the reimbursement of indirect costs or depreciation.
If there is any ambiguity in the foregoing provisions, and I submit there is none, the ambiguity was resolved by EDA’s administrative rulings, to which this Court should give consideration.
In 1989 and 1990, the Office of Inspector General of the United States Department of Commerce conducted two audits of ITD. The following brief excerpts from the final audit report furnish an enlightening backdrop for our review:
Our audit revealed significant, serious deficiencies in ITD’s financial management system and procurement practices, which resulted in substantial waste and abuse of funds provided by the federal government and the $3.7 million of improper claims. Moreover, it is quite clear that responsible officers and employees of ITD were fully aware that ITD’s accounting methods and fiscal practices did not conform to federal financial standards, but made no effort to remedy the situation until we commenced our audit. Indeed, Institute officials simply chose to ignore certain federal requirements, such as Office of Management and Budget (OMB) circulars.
During the course of our audit, it also became readily apparent that ITD’s procurement practices violated federal standards, resulting in the improper and wasteful use of more than a million dollars in federal funds.
Specifically, since 1985 ITD has purchased [$]1.1 million worth of goods and services through unjustified sole source contracts, in complete and purposeful disregard of federal requirements that mandate the maximum practicable competition in connection with procurements. The Institute consistently failed to execute adequate written contracts or agreements, which resulted in a serious lack of control over contractor performance and costs. ITD has also engaged in procurement practices which created, at the very least, the appearance of conflicts of interest and has countenanced employee activities in apparent violation of procurement conduct codes....
ITD officials agree that by not having an overhead cost allocation system they were not complying with the federal standards in OMB Circular A-110_
Findings such as the foregoing encourage me in my belief that we should not reward the misconduct above described by a benevolent interpretation of the facts and the law at issue herein. In sum, regardless of whether we give some consideration to the EDA’s holdings, as I believe we should, or whether we embark on a completely de novo review, I believe that the judgment of the district court should be affirmed. I so vote.[1]
*459 INSTITUTE FOR TECHNOLOGY DEVELOPMENT ANALYSIS OF EXPENDITURES FOR $2 MILLION DEMONSTRATION FEDERAL GRANT
[[Image here]]

. At the risk of initiating a ping-pong exchange of footnotes, I feel compelled to respond to footnote 8 of the majority opinion, particularly the portion thereof that erroneously describes the basis for my dissent, viz., "because ITD failed to claim depreciation in its Grant requests” it cannot claim it now. I do in fact state that the undisputed evidence of ITD's conduct "establishes overwhelmingly that ITD did not ask for or expect to receive payment for depreciation,” supra, at 455. However, that statement is primarily in response to my colleagues' statement that they could find no evidence of the parties' intent. See Schultz v. Metropolitan Life Ins. Co., 872 F.2d 676, 679 (5th *459 Cir.1989). It is not the be-all and end-all of the dissenting opinion. A more accurate statement of the dissent’s position is that it is predicated upon the unchallengeable fact that Grant assistance was available to ITD only if it conformed to an "approved research budget,” and none of the budgets incorporated in the Grant agreements at issue herein contained any reference whatsoever to depreciation. In other words, the claims now being made for depreciation were not “otherwise allowable” under the Grant agreements, as required by Comptroller General Report B-208871.2, entitled "Substitution.”